**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THOMAS FRANKLIN WHEELOCK

          Petitioner,

    v.

SCOTT M. KERNAN, WARDEN,

          Respondent.

_____/

No. C 05-3878 PJH

**ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS**

      Before the court is the petition for writ of habeas corpus pursuant to 28 U.S.C. §
2254, filed by state prisoner, Thomas Franklin Wheelock ("Wheelock").  Having reviewed
the parties' papers, the record, and having carefully considered their arguments and the
relevant legal authorities, the court DENIES the petition.

**BACKGROUND**

**I.    Procedural Background**

      On May 28, 1998, an Alameda County grand jury returned an indictment charging
Wheelock with capital murder under California Penal Code § 187 (count one) and with the
allegation of personal use of a firearm; with perjury under California Penal Code § 118
(count two); and with the special circumstances allegations that the murder was committed
during the course of a robbery and while Wheelock was lying-in-wait under California Penal
Code §§ 190.2(a)(17) (A) and (a)(15).

      On September 4, 2001, an Alameda County jury found Wheelock guilty of murder
under California Penal Code § 187, and found true the allegation of personal use of a
firearm under California Penal Code § 1203.06, and the special circumstance that the

United States District Court

For the Northern District of California

murder was committed during a robbery under California Penal Code § 12022.5(a).[1]  The jury found the remaining lying-in-wait special circumstance allegation not true.  On September 20, 2001, at the conclusion of the penalty phase, the jury chose a sentence of life in prison without the possibility of parole.  On November 1, 2001, the trial court sentenced Wheelock to life in prison without the possibility of parole.

Wheelock filed a direct appeal, raising numerous issues, including those that he raises in his federal habeas petition.  The California Court of Appeal affirmed his conviction, and the California Supreme Court denied review.

On September 26, 2005, Wheelock filed his federal habeas petition, which was assigned to the Honorable Jeremy Fogel, and was fully briefed on February 22, 2006.  On September 27, 2011, this fully-briefed habeas case was reassigned from the Honorable Jeremy Fogel to the undersigned judge.  Following its reassignment, it became evident that portions of the record were missing and the court ordered the state to re-submit certain documents, which it did on November 17, 2011.

## II.    Factual Background

Wheelock's conviction stems from the following facts.  On November 24, 1997, Wheelock's employer, Armored Transport, Inc. ("Armored Transport"), informed the Oakland, California police that one of its armored trucks was missing.  Wheelock and Rod Cortez were the employees on duty in the missing truck.  Wheelock was a new employee and had been working at the company for approximately one month at the time, and was being trained and supervised by Cortez.  Cortez had a reputation for being a perfectionist who often acted like a "drill sergeant" with his trainees.

The next day, on November 25, 1997, police found the Armored Transport truck behind an auto parts store in San Ramon, California.  Cortez's body was discovered inside the truck with gunshot wounds to the right side of his head and neck.

Two days later, on November 27, 1997, a Utah highway patrol officer stopped

─────────────────────

[1]Wheelock's codefendant, Peter York, pled guilty to being an accessory and second degree murder.

United States District Court

For the Northern District of California

1   Wheelock for a traffic violation, and subsequently discovered that there was a warrant out

2   for his arrest.  The officer took Wheelock into custody, and asked him if he knew why he

3   was being detained.  Wheelock responded that it was "because [he] robbed [his] work."

4   The officer then asked Wheelock whether he had hurt anyone, and Wheelock replied that

5   he had and admitted to shooting "him."  Wheelock told the officer that he "just flipped out,"

6   noting that he "was going to lose [his] job soon."

7          That same evening, Oakland police officers interviewed Wheelock in a Utah jail.

8   Wheelock cooperated, and did not deny shooting his coworker, Cortez.  Portions of the

9   interrogation were taped, but none of those portions were entered into evidence at

10   Wheelock's trial.

11          On November 28, 1997, an Alameda County prosecutor interviewed Wheelock in the

12   Utah jail.  The interview was taped and played for the jury later at Wheelock's trial.   During

13   that interview, Wheelock waived his *Miranda* rights and provided the prosecutor with a

14   detailed account of the murder.

15          Wheelock stated that the day before the shooting, he had just returned home from a

16   Caribbean cruise with his friend, Peter York.  Right before he left for the cruise, he learned

17   that the state had denied his application for authorization to work as a security guard,

18   meaning that he would be unable to continue working for his current employer, Armored

19   Transport.[2]  While he was on the cruise, Wheelock began contemplating robbing an

20   armored car and moving to Canada to "start over."  He began making notes regarding how

21   to accomplish this, including shooting his partner in the armored car.  His plan was to

22   become an "assassin" after the robbery in order to make a living.

23          Given the problem with his security guard authorization, Wheelock decided to act

24   quickly.  He had lunch with York prior to returning to work after the cruise.  He told York

25   that he was "going to do it," and asked York to leave a backpack with a change of clothes

26   and an extra gun by the side of York's house, which York did.

27   _____

28          [2]Wheelock's employment at Armored Transport was conditioned upon his ability to obtain a "guard card," namely, a state permit to carry a firearm.

1    On the day of the murder, Wheelock made a couple of mistakes at work, including

2    an error accounting for bags of money that he was transporting, and as a result, he and

3    Cortez arrived at Brinks, one of Armored Transport's customers, "very late." Wheelock

4    apologized to the Brinks employees, and claimed that Cortez subsequently got "real mad"

5    at him for doing so because according to Cortez, they were not supposed to take the blame

6    themselves for the delay.

7    Wheelock stated that he began worrying about his job security following his mistakes

8    that day, and that after he and Cortez loaded up the money at Brinks, he "just flipped."

9    While Cortez was driving away from Brinks, Wheelock drew his gun and shot Cortez three

10   times. Wheelock pushed Cortez away from the wheel, and got into the driver's seat. He

11   drove the truck to San Ramon and parked it behind a remote auto parts store. He washed

12   himself at a faucet because he was covered in blood, and then ran three to four blocks to

13   his friend York's house. Wheelock grabbed the backpack York had left for him, along with

14   a duffel bag, and returned to the armored truck. Wheelock loaded the money in the duffel

15   bag, but after realizing it was too heavy to carry, put some money in the backpack, left the

16   duffel bag in some bushes, and returned to York's house to leave some money for York, as

17   he had promised York he would do.

18   Wheelock walked to a restaurant, called a taxi, and then attempted but failed to

19   catch a train to Portland, Oregon. Instead, he took another taxi to Walnut Creek, California,

20   and located York at a video arcade. York and Wheelock returned to San Ramon and

21   retrieved the duffel bag that Wheelock had left in the bushes, and then York drove

22   Wheelock to a motel in Sacramento. Wheelock purchased a car at a used car lot, then

23   returned to his motel, but observed a police car. He decided not to retrieve the additional

24   money he had left in his motel room, but instead drove away on the freeway with the

25   approximately $28,000 he had on him at the time. Wheelock drove to Idaho, and then was

26   en route to Colorado at the time he was arrested in Utah.

27   At trial, the prosecution introduced a ten-page plan ("the Plan") that Wheelock had

28   drawn up while on the cruise with York for robbery and murder. York assisted Wheelock

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

and agreed to help him escape in exchange for $10,000.  Among other things, the Plan provided:

> (1) that Wheelock planned to commit the robbery and murder immediately upon returning from the cruise with York, on either the Monday, Tuesday, or Wednesday before Thanksgiving, because he knew there would be a large amount of cash in the armored truck at that time;

> (2) that Wheelock would kill the Armored Transport driver and take the cash;

> (3) that Wheelock would "kill everyone who gets in [his] way except Pete [York];"

> (4) that Wheelock would use his friend, Brian Gilbaugh's gun, take at least two million dollars, buy a truck and cold weather clothing, and escape to Canada; and

> (5) during his escape to Canada, Wheelock would stop only for gas and would "shoot to kill always no mercy."

The prosecution called as witnesses several police officers and the Alameda prosecutor who met with Wheelock upon his arrest in Utah.  It also called employees from Union Bank and Brinks, Armored Transport customers, who had seen Wheelock and Cortez the day of the shooting when they made their cash deliveries and pick-ups.  Two of the witnesses testified that Cortez and Wheelock often called each other, "bitch," and had what appeared to be "game" of playing around, cursing, and swearing.  They testified that Cortez and Wheelock were cursing in that same manner on the night of the shooting.

The prosecution also called to testify Wheelock's friend who helped him get the job at Armored Transport, Brian Gilbaugh.  Gilbaugh ended his shift at Armored Transport around 5:00 p.m. the day of the murder.  Gilbaugh testified that Wheelock advised him that his guard card had been denied.  Gilbaugh also testified that Wheelock did not appear unstable, and that he reassured Wheelock that he would help him find a way to obtain the permit.  Gilbaugh also testified that he had just finished working the day shift with the victim, Cortez, and that Cortez was in a good mood.  Cortez was working overtime that

United States District Court

For the Northern District of California

day, and Wheelock was assigned to ride and train with him that evening.

The prosecution also called the last person to see Wheelock and Cortez that night, a Brinks employee, Debra Vincent.  Vincent testified that Wheelock and Cortez were very late making their cash delivery that night, and that Wheelock volunteered that it was his fault. Vincent asserted, though, that Cortez was quiet and did not appear to be angry or upset.

In addition to its witnesses, in conjunction with its cross-examination of Wheelock's father, the prosecution introduced evidence that Wheelock had previously been fired from past jobs for burglary, and that he had previously pled no contest to a burglary charge and been found guilty.  It also introduced evidence that Wheelock obtained the job at Armored Transport by perjuring himself on his employment application and by lying about his prior convictions.

Wheelock's defense was that he abandoned any "plan" he had to commit the robbery and murder, and that he didn't shoot Cortez in conjunction with a premeditated murder or even in the course of a robbery.  Instead, Wheelock claimed that he had "snapped" because Cortez had been yelling at him and berating him all night long, and "pushed him over the edge," and that, as a result, he was guilty only of manslaughter - not murder.

Wheelock testified in his own defense for approximately five days, and called several witnesses in support of his theory that Cortez was a difficult person to work with and that he had abandoned the Plan he devised with York.  He argued that at the time of the shooting, he had made "virtually none" of the preparations for a robbery-murder that were listed in the ten-page Plan for the crime.  He also introduced evidence that he had suffered from depression and attention deficit hyperactivity disorder ("ADHD"), and that these conditions were a contributing factor in the crime.  Additionally, Wheelock suggested that the police officers had been lax and incomplete with their investigation.

Wheelock called several Union Bank employees who testified that they overheard Cortez publicly berating and cursing at Wheelock during the Armored Transport deliveries on the night of the crime.  Another Costco employee, a customer of Armored Transport,

testified that several weeks prior to the murder, she had a dispute with the victim, Cortez, on one occasion because he arrived early for a cash pick-up and then left without the cash when she did not have the paperwork ready.  After the incident, Costco requested that Armored Transport arrange to have someone other than Cortez make deliveries there in the future.

## ISSUES

Wheelock raises the following eight claims, one of which consists of four sub-claims:

(1) the trial court's dismissal of a juror during deliberations violated his constitutional right to due process and to a trial by a fair and impartial jury and also violated his equal protection rights;

(2)  the prosecution's failure to obtain and preserve videotape evidence violated his due process rights;

(3) the prosecution's decision to charge by indictment violated his due process rights;

(4) the Alameda County grand jury and forepersons selection procedures violated his due process and his equal protection rights;[3]

(5) the admission of Wheelock's taped statement violated his Sixth Amendment right to counsel;

(6) the admission of Wheelock's prior burglary conviction violated his due process rights;

(7) the prosecution's closing and rebuttal arguments violated his due process rights and his right to counsel; and

(8) the cumulative impact of errors merits reversal of his conviction.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's

---

[3]This claim actually consists of four sub-claims as discussed below.

United States District Court

For the Northern District of California

adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407–09, (2000), while the second prong applies to decisions based on factual determinations, *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412–13.  A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ.  *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller–El*, 537 U.S. at 340. Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011). When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.  *Harrington v.*

**United States District Court**
For the Northern District of California

*Richter*, 131 S.Ct. 770, 784–85 (2011).  When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion.  *Ylst v. Nunnemaker*, 501 U.S. 797, 801–06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir. 2000).

## DISCUSSION

**I.   Dismissal of Deliberating Juror**

Wheelock argues that the trial court's dismissal of a juror during deliberations for implied bias violated his constitutional right to due process and to a trial by a fair and impartial jury, and also that it violated his due process and equal protection rights because the juror was the sole African American on the jury.

**A.    Background**

On July 23, 2001, following jury selection, the court noted for the record discussions that transpired at sidebar conferences during voir dire.  The court discussed juror no. 8, "Ms. F." as follows:

> All right.  Okay.  Now let's go through these jurors.  This again is . . . . I can predict. . . . Juror No. 8 is going to be an ongoing problem in this trial.  She tried two attempts to be excused.  The first one, she approached the bench. We had the side bar conference, and she told me that she had been arrested for a crime.  I asked her [whether] [sic] she disclosed that on the questionnaire.  She said, yes, she did.  And I said okay, I'll take it up with the lawyers.  She said she hadn't entered a plea yet.  Her case hadn't been resolved.  I'll take it up with the lawyers.  We have a sidebar conference.  I told the lawyers that she had been arrested with this offense.  It was on her questionnaire.  Both sides said they were satisfied with her as a trial juror.

R.T. 4077-78.

Following the discussion, the juror remained on the jury, which commenced its deliberations on August 29, 2001, the week prior to Labor Day.  On September 4, 2001, the Tuesday after Labor Day and three days after the jury began deliberating, the prosecution moved to dismiss "Ms. F." based on a conflict of interest.   During jury selection, Ms. F. had stated that she was being prosecuted for "section eight" fraud.  At the September 4, 2001 hearing, the prosecutor advised the court that at the time of voir dire, he assumed that meant the juror was being prosecuted for "section eight [housing] fraud" federally and *not* by state or local authorities.  Accordingly, he assumed that there was no conflict of interest.

United States District Court

For the Northern District of California

1   However, on Friday, August 31, 2001, three days into deliberations, the prosecutor

2   discovered that the juror was indeed being prosecuted in state court for grand theft, and by

3   his office, the Alameda County District Attorney's office, nonetheless.  Additionally, the

4   prosecutor also learned that the juror was represented by an attorney from the same office

5   as Wheelock's attorney, the Alameda County Public Defender's office.  R.T. 6669.

6       At the September 4, 2001 hearing, the parties discussed on the record whether the

7   juror had misled the court when she stated that she had been charged with "section eight

8   fraud."  The trial judge recalled the pertinent sidebar with the juror, and found that she had

9   not attempted to conceal the fact that she had a criminal case pending.  *Id.*

10      Defense counsel objected to the juror's dismissal, and accused the prosecution of

11  failing to be diligent in discovering the nature of the juror's criminal case.  The defense

12  argued that the prosecution had waived its right to challenge the juror for cause.  Defense

13  counsel also questioned the prosecution's motives and timing for bringing the motion to

14  dismiss given that the jury had already been deliberating for several days. The prosecutor

15  responded that he was "not sitting on anything," and that he had just received the juror's file

16  from his office's consumer fraud division. The prosecution argued that the defense had the

17  same resources and ability to realize the conflict, and failed to so as well.

18      Additionally, in his objection to the juror's dismissal, Wheelock noted that Ms. F. was

19  an African-American female, and one of only two minorities on the jury panel.

20      Ultimately, the court gave the juror the benefit of the doubt regarding her candor and

21  assumed that the juror may not have known the difference between "welfare fraud,"

22  "section eight fraud," and state law grand theft with which she was charged.  R.T. 6673.

23  The court explained, "I don't believe the juror withheld anything from us knowingly.  As a

24  matter of fact, she went to great lengths to make that clear to us at the beginning."  R.T.

25  6677.

26      The court nevertheless granted the state's motion for dismissal.  It noted that

27  although the juror may not have knowingly withheld the information, that there was a viable

28  argument that she "should have known" to disclose the fact that she was being represented

United States District Court

For the Northern District of California

by the same office representing Wheelock and that she was being prosecuted by the same office prosecuting Wheelock. *Id.* The court further found that the state could not be deemed to have waived a for cause objection of which it was unaware. *Id.* The court stated that the issue was not whether the juror could be fair or unfair, but "whether the district attorney knew or should have known" of the conflict. After examining a copy of the juror's rap sheet available to the prosecution during the July 2001 jury selection, the court found that the prosecutor "had no way of knowing" that the juror was being represented by the Alameda County Public Defender's office based on the rap sheet. *Id.* The court further found that prosecutor did not actually know the information, either.

Concluding that it was "risky business," the court granted the state's motion to excuse the juror. The court subsequently explained to the juror that she was being excused because

> [w]hat has developed is the district attorney has determined that you are now being represented by the public defender and Mr. Ogul [Wheelock's attorney] is a member of the same office. . . . So that creates a problem. . . . There's an issue of implied bias that you have. You're sitting on a case where the attorney for the defense is from the same office, from the attorney who is representing you. And that raises the issue that maybe this might affect your deliberations somewhere down the line one way or another. . . .

R.T. 6679-80. The court noted that at the time the juror filled out her jury questionnaire on June 7, 2001, she had no way of knowing that the Alameda County Public Defender was in fact going to be representing her, and thus acknowledged that she was not being accused of doing anything wrong. The trial court also found that the prosecution's motion to dismiss the juror had nothing to do with race. R.T. 6672.

On appeal, Wheelock argued that the trial court's dismissal of Ms. F. constituted racial discrimination, and that her dismissal during deliberations for implied bias violated his constitutional rights to due process and to a trial by a fair, impartial, and unanimous jury. The state appellate court rejected this claim, noting that there was no evidence that the motion to dismiss was motivated by racial discrimination or that Ms. F. was the only juror for whom the prosecution ran a rap sheet. The court further rejected Wheelock's state law claim that as a seated juror, the prosecution was unable to demonstrate that Ms. F. was

unable to be impartial.  However, the California Court of Appeal concluded that the trial court erred under California law when it dismissed the juror based on a finding of implied as opposed to actual bias because under California Penal Code section 1089, implied bias is not a basis for dismissal.  The court nevertheless found that the error did not constitute reversible error because there was nothing to suggest that Ms. F. was favoring the defense prior to her dismissal.

The state court also rejected Wheelock's argument that the error violated his federal constitutional rights.  In a footnote, it noted that Wheelock cited to the Ninth Circuit's decision in *United States v. Symington* in support, but found that case distinguishable, determining that in Wheelock's case, there was no evidence that the juror was dismissed based on her position in the case.  195 F.3d 1080, 1086 (9th Cir. 1999).

On December 12, 2011, following reassignment of this habeas case in September 2011 to the undersigned judge, the court issued an order noting that the record before it did not include transcripts of the actual voir dire responses from Juror No. 8 referenced in conjunction with this claim.  Instead, the only transcripts the court was able to locate regarding Juror No. 8's voir dire responses were from July 23, 2001, following jury selection, when the trial court noted for the record discussions that transpired at sidebar conferences during voir dire.  R.T. 4077-78.  The court further noted that it was unable to locate in the record Juror No. 8's questionnaire, referenced in the trial court's discussion at R.T. 4077-78.  The court stated that to the extent that such transcripts and/or questionnaire existed, they were necessary and ordered respondent to supplement the record with them.

In declarations filed December 16, 2011, and January 18, 2012, counsel for respondent attested that she reviewed her office's file for the case, but that it did not contain any juror questionnaires.  She also noted that the court was correct that the transcripts do not identify the specific juror responses during voir dire.  Initially, counsel suggested that the Alameda County District Attorney's Office may have retained a "key" by which the court could ascertain from the transcripts Juror No. 8's voir dire responses, and further noted that she had requested that office's file.  However, per counsel's latest

United States District Court

For the Northern District of California

declaration, the district attorney's office's file did not contain such key.  Accordingly, respondent was unable to provide the court with either the jury questionnaire or the actual transcripts of Juror No. 8's voir responses.  The court is uncertain whether either were included in the record before the state appellate court.  However, for purposes of Wheelock's federal habeas petition, the court relies on the trial court's recollection of juror no. 8's voir dire and questionnaire responses as stated on the record in conjunction with the state's September 4, 2001 motion to dismiss the juror.

### B.   Implied Bias

#### 1.   Parties' Arguments

In his federal habeas petition, Wheelock has split the issue into two arguments: first, that the dismissal of Ms. F. for implied bias violated his constitutional right to due process and to trial by a fair and impartial jury; and second, that her dismissal was on the basis of race and violated his right to a jury selected without regard to race.

With his first sub-claim, Wheelock argues that the trial court violated his constitutional rights when it dismissed Ms. F for implied bias.  He argues that the California Court of Appeal "overlooked the controlling law," specifically, the Ninth Circuit's decision in *Symington,* and that its opinion is not entitled to any deference.  195 F.3d at 1086. Citing to *Symington*, Wheelock simply states that the state appellate court "overlook[ed] the constitutional prohibition against the removal of a deliberating juror to enhance the likelihood of conviction."

In opposition, the state notes that unlike California law, the United States Supreme Court has recognized that a juror may be discharged for implied bias - not just actual bias. *See United States v. Wood*, 299 U.S. 123, 133 (1936); *Sanders v. LaMarque*, 357 F.3d 943, 948 (9th Cir. 2004).  Accordingly, although the California Court of Appeal concluded that it was error for the trial court to dismiss the juror for implied bias under California law, the state argues that there was no federal constitutional error for the dismissal based on implied bias.  Even if there was error, the state argues that it was harmless because there was no evidence that the juror was removed at the request of other jurors or that she

displayed any opposition to the prosecution's case or that she was a holdout.  Moreover, it argues that there is no evidence that the alternative juror who substituted for her was not fair and impartial.

In reply, Wheelock argues that the removal of the juror constituted structural error, and is not subject to harmless error analysis.  Alternatively, even if it was, Wheelock argues that the dismissal compromised the composition of the jury such that it should be presumed reversible error.  Wheelock further contends without much elaboration that the state is incorrect and that removing a deliberating juror on the basis of implied bias is unconstitutional even under federal law.

### 2.    Legal Standards

#### a.    Generally

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to a trial by a fair and impartial jury.  *Irvin v. Dowd*, 366 U.S. 717, 81 (1961). The right to a jury trial is extended to state criminal trials through the Due Process Clause of the Fourteenth Amendment.  *Duncan v. Louisiana*, 391 U.S. 145, 148–149 (1968).  A defendant in a criminal case is also entitled to a jury that reaches a verdict on the basis of evidence produced at trial.  *Turner v. Louisiana*, 379 U.S. 466 (1965).

"As a general matter, the Sixth Amendment does not prohibit the mid-deliberation dismissal of jurors who are unable to serve or who engage in misconduct."  *Williams v. Cavazos*, 646 F.3d 626, 642 (9th Cir. 2011).  However, "the Sixth Amendment does not allow a trial judge to discharge a juror on account of his views of the merits of the case."  *Id.* at 642–643 (citing *Duncan*, 391 U.S. at 145).

In California state courts, discharge of jurors for cause is governed by California Penal Code section 1089, which provides that a trial court may discharge a juror who "becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor."  The Ninth Circuit has consistently held that "the California substitution procedure . . . preserve[s] the 'essential feature' of the jury required by the Sixth and Fourteenth Amendments."  *Miller*

United States District Court

For the Northern District of California

1    *v. Stagner*, 757 F.2d 988, 995 (9th Cir. 1985) (holding that trial court did not violate

2    petitioner's right to jury trial by removing two jurors and replacing them with two alternate

3    jurors despite fact that original jurors were removed on fifth day of jury deliberations); *Perez*

4    *v. Marshall*, 119 F.3d 1422, 1427 (9th Cir. 1997).

5         When a federal habeas petitioner challenges a California trial court's removal of a

6    juror, the "critical Sixth Amendment questions" for the reviewing court "are [first], whether,

7    after an appropriately limited inquiry, it can be said that there is no reasonable possibility

8    that the juror's discharge stems from his views of the merits, and, [second] whether the

9    grounds on which the trial court relied are valid and constitutional." *Williams*, 646 F.3d at

10   644.  If the answer to either question is "no," then the dismissal violates the Sixth

11   Amendment.  *Id.*

12        The reviewing court must be mindful that a trial court's findings regarding juror

13   fitness are entitled to special deference on habeas review.  *Perez*, 119 F.3d at 1426 (citing

14   *Patton v. Yount*, 467 U.S. 1025, 1036–38 & n. 12 (1984)).  However, where a state court of

15   appeal cites only state law authorities in rejecting a defendant's claim that a juror's removal

16   violated his Sixth Amendment rights, federal habeas review is *de novo*.  *Williams*, 646 F.3d

17   at 636–41.

18                     **b.     First Prong:  Whether Dismissal is Merits-Related**

19        In *Symington*, the Ninth Circuit case relied on by Wheelock, during deliberations, the

20   jury sent the court two notes requesting guidance, because "[o]ne juror has stated their

21   final opinion prior to review of all counts," and the jury felt "that the juror in question [could]

22   not properly participate in the discussion with us" because she was unable to maintain

23   focus on the topics of discussion and she refused to discuss her views with the other jurors.

24   195 F.3d at 1083.  While being questioned individually, each juror confirmed the concerns

25   raised in the notes, although "some jurors indicated that their frustration with [the juror] may

26   have derived more from their disagreement with her on the merits of the case, or at least

27   from their dissatisfaction with her defense of her views."  195 F.3d at 1084. The juror

28   testified that she simply disagreed with the majority and she was willing to discuss the case

1   with the other jurors, but that she had "bec[o]me intimidated" by the demands of the other

2   jurors to justify her views.  *Id.*  The court dismissed the juror, on the ground that she was

3   "either unwilling or unable to deliberate with her colleagues."  *Id.*

4        On appeal, the *Symington* court determined that "[w]hile there may have been some

5   reason to doubt [the juror]'s abilities as a juror, there was also considerable evidence to

6   suggest that the other jurors' frustrations with her derived primarily from the fact that she

7   held a position opposite to theirs on the merits of the case."  *Id.* at 1088.  The court

8   reversed the *Symington* defendant's conviction, reasoning that "if the record evidence

9   discloses any reasonable possibility that the impetus for a juror's dismissal stems from the

10  juror's views on the merits of the case, the court must not dismiss the juror."  *Id.* at 1087.

11  The court further "emphasize[d] that the standard is any reasonable possibility, not any

12  possibility whatever."  *Id.*  It held that "to prohibit juror dismissal unless there is no

13  possibility at all that the juror was dismissed because of her position on the merits may be

14  to prohibit dismissal in all cases, [and that] . . .  the standard of 'reasonable possibility' in

15  this context, like the standard of 'reasonable doubt' in the criminal law generally, is a

16  threshold at once appropriately high and conceivably attainable."  *Id.*

17       The *Symington* court held that under the circumstances of the case, the trial judge

18  had only two options: send the jury back to continue deliberating or declare a mistrial.  *Id.*

19  The court reasoned that to allow dismissal under the circumstances presented would

20  permit a court "[t]o remove a juror because he is unpersuaded by the Government's case,"

21  which would violate a defendant's rights.  *Id.*

22       However, in a subsequent AEDPA case, the Ninth Circuit questioned *Symington*'s

23  applicability to a habeas case.  The court characterized *Symington* as a decision under

24  Federal Rule of Criminal Procedure 23(b), not the Sixth Amendment, and thus held that the

25  standards set forth in *Symington* did not apply to that state habeas case.  *Brewer v. Hall*,

26  378 F.3d 952, 957 (9th Cir. 2004).  Additionally, the *Brewer* court further noted that

27  *Symington* was not controlling in an AEDPA case because it was not a Supreme Court

28  case.  *Id.* (citing *Clark*, 331 F.3d at 1069 (noting that although circuit law may be

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

persuasive in determining whether a state court has unreasonably applied Supreme Court law, "only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied")).

Recently, though, in *Williams*, the Ninth Circuit again addressed the applicability of *Symington* to an AEDPA case. 646 F.3d at 626. In *Williams*, the state trial court dismissed a known holdout juror and replaced him two days into deliberations, and the jury then subsequently convicted the petitioner. In deciding to dismiss the juror, the trial court questioned individual jurors one by one — including the holdout juror himself — about their views of the holdout juror's reasons for disagreeing with the jury majority. *Id.* at 631– 34.

Specifically, the jury in *Williams* began experiencing trouble with deliberations after two days and submitted a note to the judge. The judge questioned the jury foreman, who stated that one of the jurors had "probably ten or fifteen times in [their] conversations so far expressed that . . . he [did not] believe that [there was] sufficient evidence." *Id.* The judge then interrupted the jury foreman and stated that he only wanted to know about potential misconduct. *Id.* The next day, the judge halted jury deliberations and again questioned the jury foreman. The jury foreman stated that Juror No. 6 "had brought up historical instances when juries have refused to follow the law," and "had made a fairly clear statement . . . that connects the severity of the charge with — explicitly of first degree murder with his need for a higher standard." The judge then questioned Juror No. 6, who denied using a higher burden of proof and stated that "jurors should not use juror nullification."

The judge subsequently questioned each of the remaining jurors, one by one. Six jurors (Nos. 3, 5, 7, 10, 11, and 12) stated that, in their opinion, Juror No. 6 was not following the law. When questioned further, however, four of those six (Nos. 5, 7, 11, and 12) acknowledged that Juror No. 6 had never said as much, but two (Nos. 3 and 10) reported that Juror No. 6 had said, "in essence," that he would not follow the law. The other four (Nos. 1, 2, 4, and 9) thought that Juror No. 6 was following the law, and, in the words of Juror No. 2, was "being honest." Those jurors thought there was just a difference in opinion over how the law applied to the facts of the case. Juror No. 9, for example,

1  explained that Juror No. 6 had tried to explain his view, "but none of us really understood it
2  the way he did." Only five jurors (Nos. 1, 2, 5, 7, and 11) mentioned jury nullification at all,
3  of which just one (No. 2) thought Juror No. 6 might actually be engaging in the practice.
4  Additionally, two jurors (Nos. 2 and 5) made comments to the effect that Juror No. 6
5  disapproved of the theory of accomplice liability. Six jurors (Nos. 2, 3, 4, 9, 10, and 11)
6  explained that Juror No. 6 did not believe that the evidence was sufficient to prove guilt of
7  murder beyond a reasonable doubt.

8       Ultimately, the trial court in *Williams* dismissed the juror under California Penal Code
9  section 1089 "as a biased juror, because his mind is bent . . . against the prosecution." The
10  juror was replaced with an alternate, and the jury returned a guilty verdict the following day.
11  The state appellate courts affirmed the petitioner's conviction, and the federal district court
12  denied relief under AEDPA.

13       The Ninth Circuit reversed the district court's denial of habeas relief, holding that the
14  state trial court violated the petitioner's Sixth Amendment rights by dismissing the juror
15  without good cause, and possibly on the basis of his views of the merits of the case rather
16  than any permissible basis. *Id.* at 653. The court noted that its past precedent had
17  admonished that such "detailed inquiry into the jurors' thinking and motivations would
18  'compromise the secrecy of jury deliberations' and 'jeopardize the integrity of the
19  deliberative process.' " *Id.* at 649 (quoting *Symington*, 195 F.3d at 1086). The court further
20  emphasized that

> no one, including the judge, is even supposed to be aware of the views of
> individual jurors during deliberations, because a jury's independence is best
> guaranteed by secret deliberations, such that jurors may 'return a verdict
> freely according to their conscience' and their 'conduct in the jury room [may
> be] untrammeled by the fear of embarrassing publicity.'

24  *Id.* at 643–44 (quoting *Clark v. United States*, 289 U.S. 1, 16, 53 (1933)).

25       In discussing the controlling standard, the *Williams* court noted that following the
26  Ninth Circuit's decision in *Symington*, the *Brewer* court characterized *Symington* as a
27  decision under Federal Rule of Criminal Procedure 23(b), not the Sixth Amendment, and
28  thus inapplicable to an AEDPA case. The *Williams* court held that "[a]lthough [it] would not

United States District Court

For the Northern District of California

have reached the same conclusion as the *Brewer* court— *Symington* plainly adjudicated a

Sixth Amendment challenge, *see* 195 F.3d at 1085 & n. 2— [it was] now bound by and

therefore accepts [the *Brewer* court's] description of *Symington*."   However, it nevertheless

treated *Symington* as instructive on the Sixth Amendment issue in *Williams* regarding

"when it is constitutionally permissible to dismiss a juror mid-deliberations for reasons that

could be merits-related."   In support, the court noted that, "*Brewer* did not actually decide

what the Sixth Amendment does require in cases of mid-deliberation juror discharge, since

that case did not concern juror discharge, so the question remains open for us to answer

even if *Symington* did not already answer it."   *See* 378 F.3d at 955–956.

The *Williams* court then stated as follows:

> we see no reason why the Sixth Amendment standard should be any
> different from the one announced in *Symington* for Rule 23. We therefore hold
> that, to comply with the Sixth Amendment, 'if the record evidence discloses
> any reasonable possibility that the impetus for a juror's dismissal stems from
> the juror's views on the merits of the case, the court must not dismiss the
> juror.'

*Id.* (citing *Symington*, 195 F.3d at 1087).

Based on the facts in *Williams*, the Ninth Circuit concluded that the discharge of the

juror violated the Sixth Amendment because there was a "reasonable possibility that the

impetus for [Juror No. 6's] dismissal stem[med] from the juror's views on the merits of the

case."  *Id.*  Specifically, the Ninth Circuit noted that "[a]t least seven jurors expressed the

view that Juror No. 6 did not believe that the evidence was sufficient to prove guilt of

murder beyond a reasonable doubt."  *Id.*  The court reasoned that the other jurors' views as

to Juror No. 6's willingness to follow the law were mixed and the trial court ultimately did not

find that he was unwilling to do so when deciding to discharge the juror; also, most of the

jurors recalled Juror No. 6's many attempts to explain his views during deliberations, and

none of the jurors expressed the view that Juror No. 6 was biased.  There was, however,

considerable frustration on the part of those other jurors that Juror No. 6 did not agree with

them on the sufficiency of the evidence.  Alternatively, even assuming that the trial court

had cause to discharge Juror No. 6, the Ninth Circuit held that the trial court "was not

justified in acting upon that cause because there was a 'reasonable possibility' that the

United States District Court

For the Northern District of California

1    request for removal was directly connected to the juror's views on the merits." *Id.*

2         c.    **Second Prong: Valid and Constitutional Grounds**

3              **for Dismissal**

4         A petitioner in a habeas case may raise a Sixth Amendment challenge to the

5    substitution of a particular juror on grounds that there was not good cause to do so. *See*

6    *Perez*, 119 F.3d at 1426.  The trial court's knowledge that the excused juror was the sole

7    holdout for acquittal does not in itself invalidate the decision to excuse the juror. *See id.* at

8    1427 (dismissal of holdout juror permissible because juror's emotional instability that made

9    her unable to continue deliberating provided good cause for her dismissal); *cf. Sanders*,

10   357 F.3d at 948-50 (removal of known holdout juror improper when court's only justification

11   was prosecutor's representation that he would have exercised a peremptory challenge to

12   disqualify the juror if he had known of the additional material disclosed during in camera

13   juror examination but not asked about during voir dire). The court may not, however,

14   remove a juror during deliberations if the request for discharge stems from doubts about

15   the sufficiency of the government's evidence. *See Perez*, 119 F.3d at 1428.

16        In a habeas case, the Ninth Circuit has upheld the removal of a holdout juror where

17   the trial court "was forced to act, not because of [the juror's] status as a holdout juror, but

18   because of [the juror's] emotional inability to continue performing the essential function of a

19   juror—deliberation." *Id.* at 1427.  In *Perez*, the holdout juror repeatedly informed the trial

20   court that she was not "emotionally able to continue deliberations" and asked to be

21   excused. *Id.* at 1425. Specifically, the juror "indicated that she still did not want to continue

22   on the jury, but said that she would if she had to." *Id.* She explained that "it would be a very

23   emotional experience. . .  like it was yesterday with tears and everything else." *Id.*  The trial

24   court ultimately dismissed the holdout juror because of her emotional inability to continue

25   deliberating. *Id.*

26        Subsequently, in *Sanders*, the Ninth Circuit distinguished *Perez* and granted habeas

27   relief where the trial court removed the lone holdout juror, concluding that there was strong

28   evidence that the removal was motivated by the trial court's desire to have a unanimous

United States District Court

For the Northern District of California

verdict.  357 F.3d at 950. The *Sanders* court rejected the state's argument in that case that the state trial court had dismissed the juror based on implied bias, but nevertheless recognized the role of implied bias with respect to a juror's dismissal under the Sixth Amendment.  *Id.*

The *Sanders* court noted that "[u]nlike the inquiry for actual bias, in which we examine the juror's answers on voir dire for evidence that she was in fact partial, the issue for implied bias is whether an average person in the position of the juror in controversy would be prejudiced."  *Id.*  Implied bias will be found only in "exceptional" or "extraordinary" cases, *Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring), where "the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." *Tinsley v. Borg*, 895 F.2d 520, 527 (9th Cir. 1990); *see also Fields v. Brown*, 503 F.3d 755, 766 (9th Cir. 2007) (implied or presumptive bias exists where, for example, a prospective juror has a relationship to the crime itself or to someone involved in a trial, or has repeatedly lied about a material fact to get on the jury); *United States v. Allsup*, 566 F.2d 68, 71-72 (9th Cir. 1977) (two prospective jurors in a bank robbery trial were presumed biased because they were employees of the bank that was robbed, though they worked at a different branch than the one that was robbed).

The issue is "whether an average person in the position of the juror in controversy would be prejudiced."  *See Sanders*, 357 F.3d at 948-949.  "Prejudice will be presumed under circumstances in which 'the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances.'" *Id.* (citing *Tinsley*, 895 F.2d at 527). The standard is "essentially an objective one," *United States v. Gonzalez*, 214 F.3d 1109, 1113 (9th Cir. 2000), under which a juror may be presumed biased even though the juror himself believes or states that he can be impartial.  *Dyer v. Calderon*, 151 F.3d 970, 982 (9th Cir. 1998).

### 3.   Analysis

Although the state appellate court based its decision primarily on state law on this issue, the court nevertheless cited to the Ninth Circuit's decision *Symington*, 195 F.3d at 1080, in a footnote, suggesting that it considered federal law in denying Wheelock's claim. Accordingly, it appears that this case is unlike *Williams*, 646 F.3d at 636, and the state court's findings regarding the juror's fitness to serve are entitled to deference. Nevertheless, the court notes that regardless of whether the state court's findings are afforded deference or whether the juror's fitness is reviewed *de novo*, Wheelock is not entitled to relief on this claim.

This case is unlike *Symington,* 195 F.3d at 1086, or *Williams*, 646 F.3d at 642, because there is no evidence that the juror was a holdout juror, nor had the trial court been advised of that fact.  Additionally, there is absolutely no evidence that the dismissal was based on the juror's view of the case and/or the evidence.

Moreover, the state court's decision was reasonable because the record reveals that there was good cause for the juror's dismissal.  Federal law differs from the state law, on which the state appellate court relied in finding error, and, as noted, unlike California law, implied bias is a recognized basis for mid-deliberation dismissal of a juror under federal law.  Accordingly, assuming implied bias constituted good cause for dismissal of the juror in this case, there would be *no* error under federal constitutional law.  The court concludes that this is the extraordinary case in which the relationship between juror no. 8 and Wheelock's case renders it highly unlikely that a juror could remain impartial.  Not only was the juror being represented by the same office as Wheelock's attorney, but juror no. 8 was being *criminally prosecuted* by the same office that prosecuted Wheelock.  *See Fields*, 503 F.3d at 766-770.  Even if juror no. 8 was forthcoming in her understanding of her criminal case at the time she filled out the questionnaire and during voir dire, it was reasonable for the trial court to presume implied bias on her part when the truth came to light.  *See Allsup*, 566 F.2d at 71-72.  Nor was there any evidence that the prosecution did not act promptly upon discovering the information, suggesting improper motives.

United States District Court

For the Northern District of California

1    For these reasons, this sub-claim fails.

2    **C.    Race Discrimination**

3    Wheelock also argues that Ms. F. was removed without legal justification and as the

4    result of an investigation based on race.  He contends that the prosecution "singled out"

5    Ms. F., and that his equal protection rights were violated when she was dismissed based

6    on her race under *Miller El v. Dretke*, 545 U.S. 231 (2005).

7    In its opposition, the state did not address Wheelock's argument regarding race

8    discrimination.

9    In reply, Wheelock contends that the state court of appeal's finding that Ms. F. was

10   *not* singled out based on her race was an unreasonable reading of the record and is not

11   entitled to deference.  He again contends that the fact that the prosecution ran a rap sheet

12   on the juror constitutes sufficient prima facie evidence of racial discrimination.

13   For the same reasons as those stated above, this sub-claim fails.  There was no

14   evidence that the dismissal of the juror was based on anything other than the trial court's

15   concerns regarding her implied bias as a result of her connection to the attorneys on both

16   sides of Wheelock's case.

17   **II.    Prosecution's Failure to Obtain and Preserve Evidence**

18   **A.    Background**

19   Wheelock moved before the trial court to dismiss special circumstances allegations

20   in the indictment, claiming that a Brinks videotape would have demonstrated that the victim,

21   Cortez, had actually provoked the shooting.  He contended that the tape would have

22   demonstrated Cortez's hostile demeanor and the armored truck's movement after the

23   shooting.

24   Wheelock asserted that such a videotape existed based on notes the defense

25   obtained from an Oakland police officer.  The officer's notes provided that the day after the

26   shooting, a Brinks representative called Armored Transport's director for security and

27   verified that Wheelock and Cortez had dropped off money and picked up approximately

28   $300,000 in cash the night before.  The notes also stated that "Brinks has the video tape

23

United States District Court
For the Northern District of California

1   from surveillance cameras which they will hold for OPD [Oakland Police Department]."

2   Based on the notes, defense counsel attempted to obtain the videotape, but the

3   prosecution advised him that it had been lost or destroyed.

4        In support of Wheelock's motion to dismiss the special circumstances, defense

5   counsel attested that he had spoken to Brinks personnel familiar with its video surveillance

6   system and learned that the cameras were situated such that they recorded the entry and

7   exit of armored trucks.  Defense counsel thus surmised that the November 24, 1997

8   videotape likely captured Cortez yelling at Wheelock and perhaps even the shooting itself.

9   However, at the hearing on Wheelock's motion to dismiss, defense counsel advised the

10  court that he had since learned that the cameras that faced the location of the shooting did

11  not preserve anything on videotape but simply provided a live view.  Accordingly, the

12  defense conceded that the shooting probably was not preserved on the Brinks videotape.

13       Two Oakland police officers testified at the hearing on Wheelock's motion to dismiss.

14  Officer Mike Yoell, the officer whose notes defense counsel referenced in his declaration,

15  testified that Brinks told him that there was a tape that they would maintain for him, but that

16  he was unclear what was actually on the tape.  He stated that he was told the tape "would

17  show either the truck coming in to drop off money or the two people in the truck delivering

18  money or - delivering the money and maybe taking some money."  Yoell also testified that

19  the prosecution had repeatedly asked him to track down the tape, but that each time he

20  contacted Brinks, they told him they were looking for it.  Yoell even went to Brinks

21  personally to retrieve the tape, but the responsible employee was absent.  Eventually,

22  Brinks advised Yoell that the tape had been destroyed and did not exist.  Yoell thus testified

23  that the tape had never been in his or the OPD's possession, and that he was no longer

24  certain that such a tape even existed.

25       The trial court denied Wheelock's motion to dismiss, noting that even if the tape

26  existed, it would not have included any recording of conversations between Wheelock and

27  Cortez prior to the shooting.  The court further found that the exculpatory value of the tape

28  was speculative, and that no bad faith could be attributed to the police in failing to secure

**United States District Court**
For the Northern District of California

1   the tape.

2       On appeal, the state appellate court affirmed, concluding that the possibility that the

3   tape, if it existed, would have shown a hostile interaction between Cortez and Wheelock

4   was not sufficient to give the police or the prosecution reason to believe that it would "play

5   a significant role in the suspect's defense." *California v. Trombetta*, 467 U.S. 479, 488

6   (1984).

7       **B.     Parties' Arguments**

8       Wheelock makes the same arguments before this court that he made before the

9   California Court of Appeal.  He contends that the tape was exculpatory under *Trombetta*,

10  467 U.S. at 488, and that his due process rights were violated because the tape was lost or

11  destroyed as a result of the government's bad faith. *Arizona v. Youngblood*, 488 U.S. 51,

12  58 (1988).  Wheelock further argues that under *Kyles v. Whitney*, 514 U.S. 419, 437

13  (1995), the prosecution's obligation to obtain the tape was not lessened by the fact that it

14  was possessed by Brinks, a third party acting on the prosecution's behalf.  Finally,

15  Wheelock argues that the state courts should have sanctioned the state for its violation of

16  his due process rights.

17      The state contends that Wheelock has not shown that the prosecution should have

18  realized the tape was exculpatory.  It argues that more than the loss of evidence is

19  necessary to establish a due process violation under *Youngblood*, 488 U.S. at 58, and that

20  there is no evidence of bad faith by the police or prosecution.  Finally, it asserts that if there

21  was any error, it was harmless.

22      **C.     Analysis**

23      The government has a duty to preserve material evidence, i.e., evidence whose

24  exculpatory value was apparent before it was destroyed and that is of such a nature that

25  the defendant cannot obtain comparable evidence by other reasonably available means.

26  *See Trombetta*, 467 U.S. at 489; *Grisby v. Blodgett*, 130 F.3d 365, 371 (9th Cir. 1997).

27      Although the good or bad faith of the police is irrelevant to the analysis when the

28  police destroy material exculpatory evidence, the analysis is different if the evidence is only

**United States District Court**
For the Northern District of California

1    *potentially* useful:  there is no due process violation unless there is bad faith conduct by the

2    police in failing to preserve potentially useful evidence.  *Illinois v. Fisher*, 540 U.S. 544,

3    547-48 (2004); *Youngblood*, 488 U.S. at 58; *Villafuerte v. Stewart*, 111 F.3d 616, 625 (9th

4    Cir. 1997); *see, e.g., Illinois v. Fisher*, 540 U.S. at 547-48 (no bad faith failure to preserve

5    substance seized from defendant which had been tested four times and determined to be

6    cocaine – the substance was only potentially useful evidence because defendant at most

7    could hope that he could conduct another test that might show the substance to not be

8    cocaine); *United States v. Estrada*, 453 F.3d 1208, 1212-13 (9th Cir. 2006) (no bad faith in

9    part because there was no evidence of "malicious intent" by government); *United States v.*

10   *Martinez-Martinez*, 369 F.3d 1076, 1087 (9th Cir. 2004) (no bad faith failure to take blood

11   or urine samples at time of defendant's arrest where it was not readily apparent that

12   samples might have proven exculpatory for immigration crime); *United States v. Booth*, 309

13   F.3d 566, 574 (9th Cir. 2002) (no bad faith failure to preserve where government did not

14   take possession of computer hard drives but only informed third party vendor - who later

15   erased them - that it did not need copies of the information on the hard drives and where

16   there was nothing about the hard drives that would have made their allegedly exculpatory

17   nature apparent to the government).

18        Negligent failure to preserve potentially useful evidence is not enough to establish

19   bad faith and does not constitute a violation of due process.  *See Grisby*, 130 F.3d at 371.

20   The existence of a pending discovery request does not eliminate the necessity of showing

21   bad faith on the part of police who destroy potentially useful evidence.  *See Illinois v.*

22   *Fisher*, 540 U.S. at 547-48.  Nor does the fact that the potentially useful evidence is central

23   to the prosecution's case or the defendant's defense eliminate the necessity of showing

24   bad faith on the part of police who destroy it.  *Id.* at 549.

25        The government's duty to preserve material evidence is limited to evidence it has

26   gathered.  *Trombetta*, 467 U.S. at 488-90.  Although the government does not generally

27   have a duty to collect exculpatory evidence, a bad faith failure to do so may violate due

28   process.  *Miller v. Vasquez*, 868 F.2d 1116, 1119-20 (9th Cir. 1989).  Due process requires

United States District Court

For the Northern District of California

1   law enforcement to gather and collect evidence where the police themselves by their

2   conduct indicate that the evidence could form a basis for exoneration.  *Id.* at 1121 (noting

3   decision is based on *Youngblood*, 488 U.S. at 51).

4          For several reasons, this court cannot conclude that the state court's decision was

5   contrary to, or involved an unreasonable application of, clearly established Federal law, as

6   determined by the Supreme Court of the United States.  First, assuming that the tape even

7   existed, there was no evidence that it was exculpatory.  It was at best *potentially*

8   exculpatory, thus requiring Wheelock to demonstrate bad faith conduct on the part of the

9   police in failing to preserve it.  *See Fisher*, 540 U.S. at 547-48.  Based on the evidence

10  presented at the evidentiary hearing on Wheelock's motion to dismiss, especially OPD

11  Officer Yoell's testimony, the state court's finding that there was no bad faith was not an

12  unreasonable determination of the facts in light of the evidence presented in the state court

13  proceeding.  Furthermore, the tape was never in the possession of the OPD, and there was

14  no bad faith in OPD's unsuccessful attempts to obtain the evidence from Brinks.

15         For these reasons, this claim fails.

16  **III.    Prosecution's Decision to Charge by Indictment**

17         The state initially charged Wheelock with murder by a complaint that additionally

18  alleged several special circumstances.  On January 5, 1998, Wheelock filed a motion for

19  discovery, arguing that he needed the discovery so that he would be able to effectively

20  respond to the prosecution's attempt to establish preliminary cause at the upcoming

21  preliminary hearing.  On May 8, 1998, the trial court granted Wheelock's motion.  Soon

22  after, the prosecution advised the court that it had discovered some new evidence

23  supporting a perjury charge and requested that the preliminary hearing be continued.  The

24  court vacated the preliminary hearing date, and set June 2, 1998, as the deadline for

25  compliance with its order granting Wheelock's request for discovery.

26         On May 28, 1998, the prosecution then obtained a grand jury indictment charging

27  Wheelock with murder with special circumstances and perjury, and moved to dismiss the

28  complaint filed in the municipal court.  Wheelock objected, claiming that the prosecution

United States District Court

For the Northern District of California

1   had indicted him solely to avoid producing discovery and that it had sought the indictment

2   in retaliation for his exercise of his discovery rights.

3        Although the court noted that the timing was "curious," it ultimately found that there

4   was no evidence that the prosecution acted with "an ulterior motive," granted the

5   prosecution's request to dismiss the complaint, and left the matter of discovery for defense

6   counsel to pursue with the superior court.  Wheelock subsequently moved in the superior

7   court to dismiss the indictment based on vindictive prosecution, and the court denied the

8   motion.

9        On appeal, Wheelock renewed his argument that his due process rights were

10  violated by the indictment, which he contended was a vindictive, retaliatory act for his

11  exercise of his discovery rights.  The appellate court denied the claim, noting that no

12  presumption of vindictiveness arises from charging decisions made during the pretrial

13  process.  It further found that Wheelock was not entitled to a preliminary hearing, had no

14  right to the early discovery he sought for the preliminary hearing, and thus was not

15  "punished" in any legally cognizable way when the prosecution indicted him.

16       Wheelock makes the same arguments before this court that he did before the state

17  appellate court.  He contends that the prosecution's decision to charge by indictment

18  violated his due process rights because the prosecution's actual objective was not to bring

19  the additional perjury charge but to penalize him for exercising his legal discovery rights.

20  *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1977).  Wheelock further contends that the trial

21  court's factual findings to the contrary are not entitled to deference.

22       The state responds that the prosecution properly exercised its authority under state

23  law to charge by indictment.  It argues that the state court's findings on the issue preclude

24  Wheelock's claim of vindictiveness, and that Wheelock has not rebutted the findings by

25  clear and convincing evidence.  It asserts that the indictment was filed to add the perjury

26  count, which was still under investigation at the time.

27       A prosecutor violates a defendant's due process rights when he brings additional

28  charges solely to punish the defendant for exercising a constitutional or statutory right.  *See*

1    *Bordenkircher*, 434 U.S. at 363.  The defendant has the burden to show that "charges of

2    increased severity were filed because the accused exercised a statutory, procedural, or

3    constitutional right in circumstances that give rise to an appearance of vindictiveness."

4    *United States v. Gallegos-Curiel*, 681 F.2d 1164, 1168 (9th Cir. 1982).  The defendant must

5    show that the prosecutorial conduct would not have occurred "but for" the prosecutor's

6    "hostility or punitive animus towards the defendant because he has exercised his specific

7    legal rights."  *Id.* at 1168-69; *see also United States v. Frega*, 179 F.3d 793, 802 (9th Cir.

8    1999) (no vindictiveness where defendant could not show that but for animus prosecutor

9    would not have filed superseding indictment).  The burden then shifts to the prosecutor to

10   show a non-vindictive reason for bringing the charges.  *Gallegos-Curiel*, 681 F.2d at 1168.

11          When there is no evidence of actual vindictiveness, and vindictiveness must be

12   presumed, cases in which the charges increased after trial are to be sharply distinguished

13   from cases in which the prosecution increases charges during pretrial proceedings.  *See id.*

14   at 1167.  An allegation that additional charges were filed because a defendant filed a

15   pretrial motion to suppress is insufficient to create a presumption of vindictiveness.  *See id.;*

16   *see also United States v. Goodwin*, 457 U.S. 368, 381 (1982) ("It is unrealistic to assume

17   that the prosecutor's probable response to such motions is to seek to penalize and deter.");

18   *Frega*, 179 F.3d at 801-02  (no presumption of vindictiveness where prosecutor filed

19   superseding indictment following defendants' successful motion to dismiss).

20          Having reviewed the record, the state court's finding that the prosecution did not

21   possess an ulterior motive in charging by indictment was not an unreasonable

22   determination of the facts in light of the evidence presented in the state court proceeding,

23   and thus is entitled to deference.  Moreover, given the absence of evidence of

24   vindictiveness, the state court's decision was not contrary to, or involved an unreasonable

25   application of, clearly established Federal law, as determined by the Supreme Court of the

26   United States.

27          Accordingly, this claim fails.

28

United States District Court

For the Northern District of California

**United States District Court**

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IV.    Alameda County Grand Jury Selection Procedures** [4]

      **A.    Background**

      Before the state trial court, Wheelock moved to set aside the indictment based on discrimination in the composition of the grand jury.  Wheelock noted that of the nineteen members of the grand jury who indicted him, six were women, two "appeared" to be Hispanic, one was Asian, seven were African-American, and nine were Caucasian.  The foreperson was a Caucasian male.  In support of the motion, Wheelock's defense counsel investigated the composition of Alameda County grand juries for the thirty years preceding the charges in Wheelock's case.  A defense investigator examined photographs of the grand juries, along with rosters with names, in attempting to ascertain the backgrounds of the grand jurors and the forepersons.  Based on the investigator's visual examinations of the photographs and census figures for Alameda County over the past thirty years, Wheelock contended that the grand jury failed to represent a fair cross-section of the community in violation of the equal protection clause, and that the selection of the foreperson also violated the equal protection clause.  Wheelock further claimed that there were due process violations in conjunction with the selection of the foreperson and the grand jury itself.

      In conjunction with Wheelock's motion to set aside the indictment, the parties first stipulated that Wheelock was one-quarter Hispanic.  Wheelock then called four witnesses in support of his motion: (1) Judge Philip Sarkisian, an Alameda County Superior Court Presiding Judge from 1998-1999; (2) Zakiya Hooker-Bell, the Alameda County Superior Court manager for jury services; (3) Judge Ronald Sabraw, an Alameda County Superior Court judge for twelve years and the presiding judge when the grand jury that indicted Wheelock was impaneled; and (4) Robert Caturegli, the defense investigator.

      Judge Sarkisian testified that on an annual basis, the judges nominated candidates for the grand jury and also that citizens sometimes volunteered to serve as well.  The

---

[4]The court has condensed several of Wheelock's related claims into one.

United States District Court

For the Northern District of California

names of the nominees and volunteers whom the presiding judge determined to be acceptable candidates were placed in a hopper and then randomly selected to comprise the grand jury.  As for the foreperson, a district attorney who acted as legal advisor to the grand jury would provide the presiding judge with a short list of candidates, and the presiding judge would select the foreperson.

The court manager, Ms. Hooker-Bell, testified that the court did not keep records regarding the gender and/or ethnicity of the grand jurors, and noted that she had refused to provide defense counsel with prior grand jurors' addresses absent a court order requiring such disclosure, which Wheelock failed to obtain.[5]

Judge Sabraw corroborated Judge Sarkisian's description of the grand jury selection process.  He testified that he routinely nominated volunteers, that he did not recall any discussions regarding changing the selection procedures, and that he personally selected the foreperson based on his/her "people skills" and administrative ability.  Judge Sabraw also testified that while there was no specific program or policy, he had personally encouraged other judges to be mindful of geographic, racial, and economic diversity in making grand jury nominations.

Defense investigator Caturegli testified that if he was unsure of a juror's race from the photograph, he would look at their surname.  He admitted that he would have categorized Wheelock, who is one-quarter Hispanic, as Caucasian.

Following the hearing, the trial court denied Wheelock's motion and concluded that he failed to make a prima facie case of discrimination on his equal protection theory, finding that there was no evidence that Alameda County's grand jury selection process was not racially neutral.  The court also found that Wheelock failed to make out a prima facie claim of discrimination on his due process claim because he had not made the required showing of systematic exclusion.  The trial court made no findings on the gender discrimination

_____

[5]The court refused to grant such an order, and advised Wheelock's counsel that such an order would need to come from the presiding judge.  It is unclear from the record whether Wheelock subsequently pursued such an order.

United States District Court
For the Northern District of California

1   claims, and Wheelock did not request any.

2       Wheelock appealed, and on appeal, the California Court of Appeal held that

3   Wheelock abandoned any gender discrimination claims, and alternatively, that even if he

4   had not abandoned them, his showing regarding the gender composition of the grand juries

5   was "very thin," and that he had failed to "analyz[e] the gender composition of each  panel

6   or track[] gender representation over the years."

7       As for Wheelock's race discrimination claims, the appellate court concluded that

8   both his due process and equal protection challenges failed because he did not make a

9   prima facie showing of substantial underrepresentation.  The court found that his factual

10  showing regarding the selection of the grand jury foreperson over the years was

11  "particularly deficient," and that although his data regarding the composition of the grand

12  jury as a whole was more complete, there were still "noteworthy defects."  Significantly, the

13  court noted that "the force of Wheelock's presentation on the issue was considerably

14  diminished by the sloppiness of his grand jury data compilation, his failure to explain the

15  necessity of using gross population figures from the census, and the absence of any expert

16  testimony to elucidate the inferences that may be drawn from the data."  Relying on the two

17  seminal United States Supreme Court cases, the state appellate court ultimately held that

18  although Wheelock had demonstrated some disparity among his grand jury data and

19  census figures, his "statistical presentation was insufficient to make out a prima facie case

20  of underrepresentation."  *See Castaneda v. Partida*, 430 U.S. 482, 494 (1977); *Duren v.*

21  *Missouri*, 439 U.S. 357, 364 (1979).

22      **B.    Legal Standards**

23      There are two types of constitutional challenges to jury selection methods.  *See*

24  *United States v. Esquivel*, 88 F.3d 722, 725 (9th Cir. 1996). The first is an equal protection

25  challenge under the Fourteenth Amendment, and the second is a fair representation

26  challenge under the Sixth Amendment.  *Id.*

27      A criminal defendant by virtue of his conviction has standing to challenge a

28  discriminatory process of selecting grand jurors or grand jury forepersons regardless of

United States District Court

For the Northern District of California

whether he is a member of the groups excluded.  *Campbell v. Louisiana*, 523 U.S. 392, 401 (1998); *Hobby v. United States*, 468 U.S. 339, 342-46 (1984).

### 1.    Jury Selection

#### a.    Due Process

A criminal defendant has a constitutional right stemming from the Sixth Amendment to a fair and impartial jury pool composed of a cross-section of the community.  *Holland v. Illinois*, 493 U.S. 474, 476 (1990).  In contrast to an equal protection claim, a prima facie case for establishing a Sixth Amendment, fair cross-section violation does not require the appellant to prove discriminatory intent.  *See Esquivel*, 88 F.3d at 725.

In *Duren*, the Supreme Court held that to establish a prima facie violation of the fair cross-section requirement, a defendant must show that:

(1) the group alleged to be excluded is a "distinctive" group in the community;

(2) the group was not fairly represented in the venire from which the grand jury was chosen; and

(3) the underrepresentation resulted from a systematic exclusion of the group in the jury selection process.

439 U.S. at 367.

The second *Duren* prong "requires proof, typically statistical data, that the jury pool does not adequately represent the distinctive group in relation to the number of such persons in the community."  *Esquivel*, 88 F.3d at 726.  In determining whether a particular group is underrepresented in a jury venire, the Ninth Circuit has adopted an "absolute disparity" analysis.  *Id.* The "absolute disparity" is determined by subtracting the percentage of the group in the jury pool from that group's percentage of the relevant total population. *See id.*  The figure for the general population may be adjusted to reflect those who are actually eligible for jury service.  *See id.* at 726-27 (adjusting census figures for Hispanics in the general population to reflect only Hispanics over age eighteen, the minimum for jury service); *see also United States v. Torres-Hernandez*, 447 F.3d 699, 705-06 (9th Cir. 2006) (holding that district court must exclude from figures for Hispanics in general population

1   those who are not eligible for jury service due to age and other reasons). Statistical data

2   must be presented to establish the disparity; the claim must be denied if the petitioner lacks

3   such evidence, even if the lack of evidence is attributable to ineffective assistance of

4   counsel.  *See Thomas v. Borg*, 159 F.3d 1147, 1151 (9th Cir. 1998) (fair cross-section claim

5   must be denied for lack of sufficient evidence even though part of the reason for the lack of

6   evidence was caused by counsel's failure to challenge composition of jury panel prior to trial

7   and to preserve relevant statistics, which no longer existed).

8                      **b.      Equal Protection**

9           In order to establish a prima facie equal protection violation in the jury selection

10  process, an appellant "must show that the procedure employed resulted in substantial

11  underrepresentation of his race or of the identifiable group to which he belongs." *Castaneda*,

12  430 U.S. at 494.

13          In *Castaneda*, the Supreme Court articulated a three-step process for establishing a

14  prima facie equal protection case:

15          (1) establish that the group, of which the appellant is a member, is "one that is a

16          recognizable, distinct class, singled out for different treatment under the laws, as

17          written or as applied;"

18          (2) prove the degree of underrepresentation "by comparing the proportion of the

19          group in the total population to the proportion called to serve as grand jurors, over a

20          significant period of time;" and

21          (3) discriminatory intent, which may be established by showing that a selection

22          procedure "is susceptible of abuse or is not racially neutral," thus supporting the

23          presumption of discrimination raised by the statistical showing under step two.

24  *Id.* at 494.

25          "Once the defendant has shown substantial underrepresentation of his group, he has

26  made out a prima facie case of discriminatory purpose, and the burden then shifts to the

27  State to rebut that case."  *Id.*  In order to rebut the presumption of unconstitutional action,

28  the state must show "that permissible racially neutral selection criteria and procedures have

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1   produced the monochromatic result." *Id.* at 494.

2        **2.**     **Foreperson Selection**

3        **a.**     **Due Process**

4        Purposeful discrimination against protected groups in the selection of a federal grand

5   jury foreperson is a violation of a defendant's due process rights.  *See Hobby*, 468 U.S. at

6   342-46.  In order to establish a violation of a petitioner's due process rights, he must show:

7   (1) the foreperson selection process was discriminatory; and (2) the role of the grand jury

8   foreperson exceeds ministerial and clerical duties.  *Id.* at 346; *see also Campbell*, 523 U.S.

9   at 402 (petitioner must show that the foreperson undertook "significant duties that he would

10  not have had as a regular grand juror").

11       **b.**     **Equal Protection**

12       In order to show that an equal protection violation has occurred in the context of

13  grand jury foreperson selection, the test is the same as the equal protection test set forth

14  above with respect to grand jury selection.  *See Rose v. Mitchell*, 443 U.S. 545, 565 (1979)

15  (citing *Castaneda,* 430 U.S. at 494).  The accused generally must show that the procedure

16  employed resulted in substantial underrepresentation of an identifiable group.  *Id.*  The first

17  step is to establish that the group is one that is a recognizable, distinct class, singled out for

18  different treatment under the laws, as written or applied.  *Id.*  Next, the degree of

19  underrepresentation must be proved, by comparing the proportion of the group in the total

20  population to the proportion called to serve as foreperson over a significant period of time.

21  *Id.*  Finally, a selection procedure that is susceptible of abuse or is not racially neutral

22  supports the presumption of discrimination raised by the statistical showing.  *Id.*

23  **C.**     **Analysis**

24       Wheelock contends that the Alameda County grand jury selection procedures

25  violated both his due process and equal protection rights.  He raises four sub-claims in

26  conjunction with this claim: (a) that the absence of a single Asian or Hispanic foreperson for

27  decades, along with the underrepresentation of women as forepersons, was the result of a

28  selection process that violated the equal protection of the law; (b) the absence of a single

**United States District Court**

For the Northern District of California

1  Asian or Hispanic foreperson for decades, along with the underrepresentation of women as

2  forepersons, was the result of a selection process that violated the due process of law; (c)

3  women, Asians, and Hispanics were systematically underrepresented because of purposeful

4  discrimination in violation of his equal protection rights; and (d) women, Asians, and

5  Hispanics were systematically underrepresented in violation of his due process rights.   The

6  court begins by addressing Wheelock's race discrimination claims, both the due process

7  and equal protection claims as applied to the grand jury selection and the grand jury

8  foreperson selection, and then, given the fact that the state appellate court concluded that

9  Wheelock waived the gender discrimination claims, the court has addressed the gender

10  discrimination sub-claims separately.

11        **1.**    **Race Discrimination Sub-Claims: Grand Jury**

12            **a.**    **Due Process**

13        In this case, it is undisputed that Asian and Hispanic persons constitute a cognizable

14  group under *Duren.  See United States v. Cannady*, 54 F.3d 544, 547 (9th Cir. 1995).

15  Wheelock thus established the first prong of his prima facie showing.

16        As for the second prong, the California Court of Appeal concluded that Wheelock

17  failed to show that Asians and Hispanics were not fairly represented as venire persons or

18  as jury forepersons.[6]  Specifically, the state court found:

19          Wheelock's data on the composition of the grand jury as a whole were more
        complete [than his data regarding the selection of the grand jury forepersons],

20          but still included noteworthy defects.  We consider only the data for grand
        juries from 1980-1981 through 1998-1999.  The earlier data were not only

21

22          [6]Both parties misconstrue the California Court of Appeal's holding on the due process

23  issue in their briefs before this court.  The state appellate court held that "both [Wheelock's]
equal protection and due process challenges must fail," noting that its "review of the record

24  convinces us that Wheelock failed to make a prima facie showing of substantial
underrepresentation."   Subsequently, the court noted in a footnote that "Wheelock's due

25  process claim is *also* defective because he has made no attempt to show actual prejudice, as
he must do to obtain a reversal on due process grounds."  Although the court initially cited to

26  *Castaneda*, 430 U.S. at 494, and referred to "substantial underrepresentation," contrary to the
parties' characterizations, the state court was clearly addressing the second prongs of *both* the

27  equal protection and due process claims when it discussed and analyzed the evidence of
absolute disparity in the three pages that followed.  Moreover, the state court concluded its

28  absolute disparity analysis with citations to both the seminal due process case, *Duren v.
Missouri*, 439 U.S. at 364, and the seminal equal protection case, *Castaneda.*

remote in time, but also were not linked to the selection process described in the testimony.  Indeed, Wheelock presented no evidence of the process used before 1989.  Nevertheless, we will examine the data for the 1980's to determine whether there was a pattern of unconstitutional underrepresentation.

There are some obvious anomalies in the numbers.  The roster for each year shows 19 grand jurors, yet Wheelock's racial breakdowns reflected a total of 20 grand jurors in 1983-1984, 1989-1990, 1991-1992, 1997-1998, and 1998-1999.  The breakdowns totaled only 18 grand jurors in 1984-1985, 1990-1991, 1992-1993, 1994-1995, and 1996-1997.  Only 17 jurors were reflected in the 1986-1987 and 1995-1996 breakdowns, and only 15 in 1980-1981.  thus, of the 19 years under consideration, Wheelock's categorization of the grand jurors' race accurately reflected the total number of jurors in only 6 years.  The proportional comparisons that may be drawn from these figures are necessarily skewed.  We note also that in 1982-1983, Wheelock claimed there were no Asian grand jurors and 3 Hispanics, but the roster for that year includes 3 Asian names and no Hispanic names.  In 1992-1993, Wheelock claimed there were no Asian grand jurors, but the roster shows one Asian name.  We have corrected the latter two errors for purposes of our analysis.

In weighing the grand juror numbers against the census data relied on by Wheelock, we also keep in mind that gross population statistics do not accurately reflect the number of those eligible for grand jury service. [] Our Supreme Court has held that total population figures may be used by a defendant to establish significant disparities in juror pools, but only if more refined statistics reflecting the proportion of those eligible for jury service are not available.  *People v. Bell*, 49 Cal.3d 502, 526 n. 12 (Cal. Sup. Ct. 1989).  Here, Wheelock attached to his motion at least one "more refined" breakdown showing the adult populations of the racial groups in Alameda County, prepared in August 1991 for purposes of supervisorial redistricting.  He did not rely on this data in his arguments, however, nor did he show that such data were unavailable for other relevant time periods.

Finally, before turning to the numbers we note that Wheelock offered no expert statistical or demographic testimony, as is common in similar litigation.

Wheelock's data showed the grand jury that indicted him included 10 Caucasians, 7 African Americans, 1 Asian, and 2 Hispanics.  Assuming the "extra" juror in these numbers was Caucasian, this grand jury was 47.4% Caucasian, 36.8% African-American, 5.3% Asian, and 10.5% Hispanic.  According to Wheelock's numbers (with the corrections noted above), on the grand juries from 1990-1991 through 1998-1999, there were 92 Caucasians (63%), 33 African-Americans (22.6%), 9 Asians (6.2%) and 12 Hispanics (8.2%).  From 1980-1981 through 1998-1999, there were 250 Caucasians (70.1%), 58 African-Americans (16.4%), 22 Asians (6.2%), and 24 Hispanics (6.8%).

The 2000 census numbers reflected a county population that was 48.8% Caucasian, 14.9% African-American, 20.4% Asian, and 19% Hispanic.  An average of the 1990 and 2000 census numbers provides proportions of 54.2% Caucasian, 16.4% African-American, 17.0% Asian, and 16.4% Hispanic.  The average of the 1980 and 1990 census figures was 63.3% Caucasian, 18.2% African-American, 11.4% Asian, and 12.8% Hispanic.  An average of the 1980, 1990, and 2000 census numbers yields proportions of

58.5% Caucasian, 17.1% African-American, 14.4% Asian, and 14.9% Hispanic.

Thus, the following "absolute disparities" can be drawn from the data.[7]  The percentage of Hispanics on Wheelock's 1997-1998 grand jury was 8.5% less than the percentage in the 2000 census, and 5.9% less than the average of the 1990 and 2000 census figures.  The percentage of Asians on this grand jury was 15.1% less than the percentage in the 2000 census, and 11.7% less than the average of 1990 and 2000 census figures.  Looking at the composition of the grand juries over time, the percentage of Hispanic grand jurors in the 1990's was 8.2% less than the average of the 1990 and 2000 census figures; in the 1980's, the Hispanic percentage was 6% less than the average of the 1980 and 1990 census figures.  Comparing the Hispanic grand juror percentage over both decades with the average of the 1980, 1990, and 2000 censuses, the absolute disparity for Hispanics was 8.1%.  The corresponding disparities for Asians were 10.8% in the 1990s, 5.2% in the 1980s, and 8.2% over both decades.

Neither [the California] Supreme Court or the United States Supreme Court has decided what degree of disparity is unconstitutional.  We conclude Wheelock's statistical presentation was insufficient to make out a prima facie case of underrepresentation.  In a county like Alameda, with substantial populations of four major racial groups, it is unrealistic to expect grand juries of only 19 members to consistently mirror demographic trends in the county.  [] Most of the absolute disparities noted in the paragraph above are less than 10%.  While it appears that in the 1990s, and on Wheelock's grand jury in particular, the selection process did not keep up with a rapid increase in the Asian population, this evident failing constitutes neither a "substantial underrepresentation over a significant period of time," *Castaneda v. Partida*, 430 U.S. at 494, nor an unfair and unreasonable representation of Asians on grand juries.  *Duren v. Missouri*, 439 U.S. at 364.

At the outset, Wheelock contends that this court should review the state trial court's findings on the issue as opposed to those above of the California Court of Appeals, and even respondent has cited to the trial court's findings.

In conjunction with the state appellate court's above findings and conclusions, Wheelock argues that the court was required to credit his supporting statistics and data as a matter of law because he sought access from the government for more comprehensive data in support of his motion but the government denied his request.  Wheelock contends that his data demonstrated an "absolute disparity" between the proportion of Hispanics,

---

[7]The court noted that "Wheelock discussed various methods of statistical comparison in his motion papers, but applied none of them to the data he submitted."  It further noted that, "[a]t the hearing in the trial court, he accepted the absolute disparity standard for purposes of his motion. (Though counsel misspoke and referred to 'comparative disparity,' the context conclusively shows he was adopting the absolute disparity standard.)"

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   Asians, and women in the population and on the grand jury, and that the California Court of

2   Appeal was required to credit his data on the issue.  In opposition, the state argues that the

3   state appellate court found significant flaws with Wheelock's data compilation and also that

4   he failed to present any expert statistical or demographic testimony.

5        On federal habeas review, this court reviews the "last reasoned decision" of the

6   state court, which in this case is clearly the California Court of Appeal's decision as set

7   forth above. *See Ylst*, 501 U.S. at 803-04; *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th

8   Cir. 2005).

9        Reviewing that decision, the court cannot conclude that any factual determinations

10  made by the state appellate court set forth above are objectively unreasonable in light of

11  the evidence.  Such findings are presumed correct absent clear and convincing evidence to

12  the contrary, and a decision adjudicated on the merits in a state court and based on a

13  factual determination will not be overturned on factual grounds unless objectively

14  unreasonable in light of the evidence presented in the state-court proceeding.  *See Miller-El*

15  *v. Cockrell*, 537 U.S. at 340.  Here, the California Court of Appeal undertook a very detailed

16  and comprehensive review and analysis regarding the deficiencies of Wheelock's data, and

17  also pointed out in several instances, where significant data was absent from Wheelock's

18  evidence in support of his claims.  The court also set forth its own extensive and reliable

19  analysis of the data before it.  There is no evidence that the state appellate court's findings

20  were objectively unreasonable.

21       Nor may the court conclude that "there is no possibility fairminded jurists could

22  disagree that the state court's decision conflicts with [the Supreme Court's] precedents"

23  with respect to its conclusion that the absolute disparities that it found did not establish a

24  prima facie case for the unfair and unreasonable representation of Asians and Hispanics on

25  Alameda County juries.  *See Harrington*, 131 S.Ct. at 784.  Given the fact that the United

26  States Supreme Court has not decided what degree of absolute disparity is constitutional,

27  the court cannot conclude that the state appellate court's conclusion was contrary to §

28  2254(d).

United States District Court

For the Northern District of California

1       Moreover, the court notes that based on the California Court of Appeal's absolute

2  disparity findings, the average absolute disparities were 8.1% for Hispanics and 8.2% for

3  Asians, below the 10% or less that both federal courts and state courts have generally

4  concluded is not sufficient to establish a prima facie case in either equal protection or fair

5  cross section cases.  *See* Beale et al., Grand Jury Law & Practice § 3:19 (2d ed. 2011)

6  (citing cases).  In fact, there do not appear to be any cases in which a court applying only

7  the absolute disparity analysis found a disparity of less than ten percent to be significant.

8  *See id.* (citing cases).  Moreover, the origin of the ten percent figure is the Supreme Court's

9  statement in *Swain v. Alabama* that it could "not say that purposeful discrimination based

10  on race alone is satisfactorily proved by showing that an identifiable group in the

11  community is underrepresented by as much as 10 percent."  380 U.S. 202, 208-9 (1965).

12       For these reasons, the court concludes that the California Court of Appeal's decision

13  that Wheelock's due process rights was not violated was neither contrary to, nor involved

14  an unreasonable application of, clearly established Federal law, as determined by the

15  Supreme Court of the United States.

16             **b.**      **Equal Protection**

17       Again, as with the due process claims, the state appellate court found for the

18  reasons set forth above that Wheelock failed to make a prima facie case under *Castaneda*,

19  430 U.S. at 494, because he could not establish that Asians and Hispanics were sufficiently

20  underrepresented as grand jurors in support of an equal protection claim.  For the same

21  reasons as those set forth above, the court concludes that the California Court of Appeal's

22  decision that Wheelock's Sixth Amendment equal protection rights were not violated was

23  neither contrary to, nor involved an unreasonable application of, clearly established Federal

24  law, as determined by the Supreme Court of the United States.

25          **2.**      **Race Discrimination Sub-Claims: Grand Jury Forepersons**

26       Regarding the foreperson claims, the state appellate court essentially found that

27  Wheelock made an inadequate prima facie showing on both the due process and equal

28  protection claims.  Specifically, the California Court of Appeal held:

Wheelock's factual showing was particularly deficient regarding the selection of the grand jury foremen over the years. He relied on the grand jury rosters to identify the foremen and their race. However, those rosters did not specify the foremen of the five grand juries preceding the one that indicted Wheelock. The testimony of Judge Sabraw identified the foreman of the 1996-97 grand jury as Neil Goodhue, who was also foreman of the 1997-1998 grand jury that considered Wheelock's case. Nevertheless, without any indication of the race of the foremen in the years 1992-1993 through 1995-1996, it is impossible to determine whether Goodhue's selection in the next two years was the product of persist[ent] racial discrimination.

The court cannot conclude that the above factual determinations made by the state appellate court were objectively unreasonable in light of the evidence, and there is no clear and convincing evidence to the contrary. *See Miller-El v. Cockrell*, 537 U.S. at 340. Given the inadequacies in Wheelock's showing, it was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, for the state appellate court to conclude that he was unable to make out a prima facie case under either *Rose*, 443 U.S. at 565, or *Castaneda,* 430 U.S. at 494. *See Thomas*, 159 F.3d at 1151.

### 3.    Gender Discrimination Sub-Claims

The California Court of Appeal's determination that Wheelock abandoned any gender discrimination claims constitutes an independent and adequate state procedural rule such that federal habeas review of the claims is barred, and the court finds that Wheelock has not established otherwise. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Nevertheless, the court also concludes, that even if the sub-claims were not procedurally defaulted, the California Court of Appeal's alternative holding that Wheelock's showing regarding the gender composition of the grand juries was "very thin," and that he had failed to "analyz[e] the gender composition of each panel or track[] gender representation over the years" is entitled to deference and was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. *See Thomas*, 159 F.3d at 1151.

For the above reasons, all of Wheelock's sub-claims pertaining to the selection of

**United States District Court**

For the Northern District of California

1  grand jurors and forepersons fail.

2  **V.    Admission of Wheelock's Taped Statement**

3       Wheelock filed a motion to exclude all of his extrajudicial statements before the state

4  trial court, including a taped interview that he gave to an Alameda County prosecutor on

5  November 28, 1997, which as noted, was later played for the jury at Wheelock's trial.

6  Wheelock argued that his Sixth Amendment rights were violated when the prosecutor

7  interviewed him without his attorney present, and noted that prior to his interview with the

8  prosecutor on November 28, 1997, that same afternoon, he had appeared with an

9  appointed Utah attorney at a preliminary extradition hearing to determine whether he

10  should be extradited to California.

11       The trial court held an evidentiary hearing on Wheelock's motion to exclude his

12  taped statements to the Alameda prosecutor, Eric Von Geldern and investigator, Stephen

13  Matsumoto, during which both Von Geldern and Matusmoto testified.  Von Geldern testified

14  that he was on rotation to the OPD Homicide Division at the time of the crime and

15  Wheelock's subsequent arrest.  On Friday, November 28, 1997, the day after Wheelock's

16  arrest, Von Geldern called the Utah authorities, determined that Wheelock was in custody

17  there, and was advised that Wheelock had not been appointed counsel.  Von Geldern

18  advised Utah authorities that an arrest warrant had issued for Wheelock.

19       That same evening, Von Geldern and Matsumoto flew to Utah and interviewed

20  Wheelock in a library at the Utah jail.  Matsumoto read Wheelock his *Miranda* rights,

21  activated the tape recorder, and read Wheelock his *Miranda* rights for a second time.

22  Wheelock waived his rights and agreed to speak with Von Geldern and Matsumoto

23  regarding the murder.  Wheelock advised them that the Utah extradition proceedings had

24  been put over until the following Monday, December 1, 1997, but did *not* advise them that

25  he had been appointed an attorney in connection with the extradition proceedings.

26       Von Geldern testified at the evidentiary hearing that at the time he interviewed

27  Wheelock, he was not aware that Wheelock had been appointed an attorney in Utah.  Von

28  Geldern also testified that he was aware of but had not listened to the statement that

42

United States District Court

For the Northern District of California

1    Wheelock gave the OPD the night before on November 27, 1997.   Von Geldern testified

2    that his questions to Wheelock were based on the murder, and specifically on Wheelock's

3    handwritten Plan.  He attested that he neither threatened nor coerced Wheelock to talk to

4    him.  Matsumoto confirmed Von Geldern's testimony in its entirety.

5            Wheelock argued to the trial court that his statements to Von Geldern and

6    Matsumoto should be suppressed because the prosecutor questioned him in the absence

7    of the attorney he had been appointed in Utah in conjunction with his extradition to

8    California.  The state countered that Wheelock's Utah counsel was not representing him

9    with respect to the California robbery and/or homicide charges, which hadn't even been

10   filed yet in Alameda County, but only with respect to the Utah extradition proceedings.  The

11   state argued that Wheelock's Sixth Amendment rights had not yet attached with respect to

12   the criminal proceedings because no charges had been filed at that time.

13           The trial court denied Wheelock's motion and held that his Sixth Amendment rights

14   were not violated.  First, the court held that Wheelock's Sixth Amendment rights had not

15   attached with respect to the homicide investigation because there had been no formal

16   charge, preliminary hearing, indictment, information or arraignment.  Relying on *Texas v.*

17   *Cobb,* 532 U.S. 162, 172 (2001), and *McNeil v. Wisconsin*, 501 U.S. 171, 181 (9th Cir.

18   1991), the court noted that the Sixth Amendment right to counsel is offense-specific, and

19   held that there was no *Massiah* violation because Wheelock's attorney had been appointed

20   for the extradition proceedings and not in connection with the homicide investigation.

21   *Massiah v. United States*, 377 U.S. 201, 206 (1964).

22           On appeal before the California Court of Appeal, Wheelock argued that he had been

23   arrested in Utah under a California arrest warrant for homicide, and that it was that arrest

24   that resulted in the extradition proceedings.  He contended that the arrest warrant and

25   extradition proceedings were part of California's homicide prosecution, and thus that his

26   Sixth Amendment right to an attorney had attached with respect to the homicide

27   prosecution at the time Von Geldern and Matsumoto interviewed him.

28           The California Court of Appeal affirmed the trial court's denial of Wheelock's motion,

43

United States District Court

For the Northern District of California

1  and agreed that Wheelock's Sixth Amendment right to counsel had not yet attached at the

2  time of the interrogation under California or federal law.  The state appellate court held that

3  "[t]he commencement of extradition proceedings is not enough, by itself, for the Sixth

4  Amendment right to counsel to attach."  It further reasoned that under established United

5  States Supreme Court law, the right to counsel had not attached because Wheelock had

6  not yet been charged and "the prosecution was still in the investigatory stage when

7  Wheelock was questioned."  In so holding, the California Court of Appeal noted

> [t]here is no case law from the United States Supreme Court or any California
> state court on whether extradition proceedings might be considered
> 'adversary judicial proceedings' at which the Sixth Amendment right to
> counsel attaches. The question has been settled in the Federal Circuit Courts
> of Appeal, however.  *E.g., United States v. Yousef,* 327 F.3d 56, 142, fn. 66
> (2nd Cir. 2003) (extradition proceedings are not criminal proceedings, but civil
> proceedings related to criminal proceedings in another jurisdiction, and thus
> do not trigger any Sixth Amendment protections); *DeSilva v. DiLeonardi*, 181
> F.3d 865, 868–869 (7th Cir. 1999) ("the Sixth Amendment does not apply to
> extradition"); *Chewning v. Rogerson*, 29 F.3d 418, 420 (8th Cir. 1994) ("It is
> well settled that extradition proceedings are not considered criminal
> proceedings that carry the Sixth Amendment guarantee of assistance of
> counsel"); *Judd v. Vose*, 813 F.2d 494, 497 (1st Cir.1987) (extradition hearing
> has modest function not involving guilt or innocence, and is not criminal
> proceeding within meaning of Sixth Amendment).

The state appellate court then held that it "agree[d] with the approach taken by the

Federal Courts of Appeal."  Accordingly, it reasoned that

> [t]he commencement of extradition proceedings is not enough, by itself, for
> the Sixth Amendment right to counsel to attach. Any other rule would be
> inconsistent with the United States Supreme Court's recognition that, before
> the formal instigation of charges, the investigative functions of the police
> should not be "unnecessarily frustrate[d]" by overprotective application of the
> Sixth Amendment.  *Maine v. Moulton,* 474 U.S. 159, 179–180 (1985)
> (investigative powers are limited by Sixth Amendment only as to pending
> charges); accord, *Texas v. Cobb*, 532 U.S. at 170–171; *see also, e.g., McNeil
> v. Wisconsin*, 501 U.S. at 181 (admissions of guilt after valid Miranda waivers
> serve compelling interest in solving and punishing crime).

In their federal habeas briefs, the parties make the same arguments that they did

before the California courts as set forth above.

The Sixth Amendment right to counsel attaches "only at or after the time that

adversary judicial proceedings have been initiated against [a defendant]."  *Kirby v. Illinois*,

406 U.S. 682, 688 (1972).  Adversary judicial proceedings are initiated by way of formal

44

United States District Court

For the Northern District of California

1  charge, preliminary hearing, indictment, information, or arraignment.  *See United States v.*

2  *Gouveia*, 467 U.S. 180, 188 (1984); *Brewer v. Williams*, 430 U.S. 387, 398 (1977).  *Kirby*

3  forecloses application of the Sixth Amendment right to counsel to events occurring before

4  the initiation of adversary proceedings.  *See United States v. Ash*, 413 U.S. 300, 303 n.3

5  (1973); *see, e.g., United States v. Charley*, 396 F.3d 1074, 1082 (9th Cir. 2005) (Sixth

6  Amendment right to counsel does not apply in tribal court criminal proceedings, including

7  arraignment); *Anderson v. Alameida*, 397 F.3d 1175, 1180-81 (9th Cir. 2005) (defendant's

8  appearance for extradition hearing did not cause right to counsel to attach as to the felony

9  charges in the receiving state where defendant was arrested pursuant to the filing of a

10  complaint for an arrest warrant because the filing of the complaint did not commit the

11  receiving state to prosecuting the defendant).

12  Attachment of the right to counsel alone does not guarantee a defendant the

13  assistance of counsel; the right must also be invoked by hiring an attorney or asking that

14  one be appointed.  *See United States v. Harrison*, 213 F.3d 1206, 1209 (9th Cir. 2000).

15  But where a defendant has an ongoing relationship with counsel before formal charges

16  against him are filed and the prosecution knew or should have known of the relationship,

17  the Sixth Amendment right to counsel is invoked at the time it attaches.  *See id.* at 1213

18  (when there is a close nexus between the focus of a pre-indictment investigation and the

19  ultimate charges, an ongoing attorney-client relationship that began before indictment will

20  invoke the right to counsel once that right attaches at indictment if the government knows,

21  or should have known, that the defendant is represented by counsel).

22  Once the right to counsel attaches, counsel must be present at all "critical stages" of

23  the prosecution, absent an intelligent waiver by the defendant.  *United States v. Wade*, 388

24  U.S. 218, 226, 237 (1967); *United States v. Hamilton*, 391 F.3d 1066, 1070-71 (9th Cir.

25  2004).  The stages of a prosecution deemed "critical" for Sixth Amendment purposes

26  include arraignments, post-indictment identification lineups, hearing on pre-trial motion to

27  suppress evidence, sentencing, court-ordered psychiatric examinations to determine

28  competency to stand trial and future dangerousness, the decision whether to plead guilty,

United States District Court

For the Northern District of California

and the process of plea bargaining and period of potential cooperation with the government. *See id.* at 1070 (citing cases). Where counsel is absent during a critical stage, the defendant need not show prejudice because the adversarial process itself has become presumptively unreliable. *See Hamilton*, 391 F.3d at 1071-72 (taking of testimony against defendant during his suppression motion without his lawyer present violated his 6th Amendment right to the assistance of counsel during critical stages of the proceedings and this defect was structural error).

An accused is denied "the basic protections" of the Sixth Amendment "when there [is] used against him at his trial evidence of his own incriminating words, which federal agents . . . deliberately elicited from him after he had been indicted and in the absence of his counsel." *Massiah*, 377 U.S. at 206. Put differently, once the right to counsel has attached, the Sixth Amendment is violated if the state takes action "'designed deliberately to elicit incriminating remarks.'" *Beaty v. Stewart*, 303 F.3d 975, 991 (9th Cir. 2002). But such is not the case "'whenever – by luck or happenstance– the State obtains incriminating statements from the accused.'" *Id.* The inquiry into whether the state action was deliberate is objective; the subjective intent of the state officer or the informant is not relevant. *Beaty*, 303 F.3d at 991 (no violation of right to counsel in conducting group discussion sessions at a prison because they were not designed to elicit confessions).

Wheelock's case is very similar to *Anderson*, in which the Ninth Circuit rejected a petitioner's Sixth Amendment claim under nearly identical circumstances. *See* 397 F.3d at 1180. In *Anderson*, there was an arrest warrant for the petitioner for murder and robbery pending in San Francisco, California. *Id.* at 1178. Six days after the issuance of the California warrant, petitioner was stopped by New Hampshire police when they observed him riding his bicycle with a rifle strapped to his back. *Id.* The officers then discovered the outstanding California arrest warrant and placed the petitioner in custody. A New Hampshire public defender was appointed to represent the petitioner in connection with the extradition proceedings. *Id.* Subsequently, while in transit from New Hampshire to San Francisco, California, San Francisco police officers interviewed the petitioner after he

United States District Court

For the Northern District of California

1    waived his *Miranda* rights.  *Id.*    The *Anderson* petitioner subsequently argued that the

2    prosecution's use of his in-transit statements to SFPD officers violated his Sixth

3    Amendment rights.  The Ninth Circuit disagreed, and held that under *Texas v. Cobb*, 532

4    U.S. at 172, the petitioner's Sixth Amendment right to counsel in connection with the

5    murder and robbery charges in California did not attach simply because the petitioner had

6    been appointed counsel in conjunction with extradition proceedings in New Hampshire.

7    397 F.3d at 1180.

8         For the same reasons as those set forth in *Anderson*, the court concludes that

9    Wheelock's Sixth Amendment claim fails, and the state appellate court's decision was not

10   contrary to, or involved an unreasonable application of, clearly established Federal law, as

11   determined by the Supreme Court of the United States.

12   **VI.    Admission of Wheelock's Prior Burglary Conviction**

13        During trial, Wheelock advised the court that he intended to call his father to testify

14   to his character of non-violence.  He noted, however, that he did not intend to "open the

15   door" for the prosecution to cross-examine him regarding a prior misdemeanor burglary

16   conviction.  Nevertheless, Wheelock argued that even if the door was opened on his

17   father's direct examination, the court should prohibit cross-examination on the conviction

18   pursuant to state law.  The prosecution countered that under state law, once the

19   defendant's character is put in issue by a defense witness, his entire character comes into

20   play.  The trial court subsequently ruled that the prosecution could cross-examine

21   Wheelock's father regarding only Wheelock's character trait or traits to which his father

22   testified.  R.T. 5358-5359.  The court stated that

23        if any trait is opened up [by the defense on direct examination] then the
          prosecutor can pursue the cross-examination with respect to any of these
24        things that involved the trait, including [Wheelock's] lying on his [security
          guard employment] application, maybe the burglary confiction and so forth. . .
25        .

26        On direct, Wheelock's father testified that Wheelock had at least thirty jobs over a

27   three-year period prior to his arrest in the case, many of which lasted only a few days.  He

28   testified that he wasn't sure why that was the case because his son was industrious and a

47

United States District Court
For the Northern District of California

hard worker, but he guessed that Wheelock had been fired from his jobs due to his learning disability.  In particular, his father testified about a job that Wheelock had at a restaurant just a couple years before his arrest in this case.  According to his father, Wheelock was terminated because he was unable to remember the items on the menu.  In spite of his disappointment over losing the job, Wheelock was out looking for another job within an hour.  Wheelock's father also testified that Wheelock had never committed an act of violence in all of his life.

On cross-examination, the prosecution inquired of Wheelock's father regarding other jobs he had held, including one job at a security company that Wheelock lost due to his involvement in a burglary on the job.  The defense objected to the question, and the trial court overruled the objection.  Wheelock's father denied knowing anything about the suspected burglary, and the prosecution then entered a plea agreement into evidence by which Wheelock had pleaded no contest to a misdemeanor burglary charge.  Defense counsel objected, but the trial court overruled the objection, determining that defense counsel's questions regarding Wheelock's jobs and his job terminations "opened up" the cross-examination for such evidence.

Wheelock subsequently testified in his own defense, and admitted that he had pleaded guilty to misdemeanor burglary after an arrest for burglarizing vending machines at a prior job.  However, Wheelock claimed that he was innocent and that the only reason that he pleaded guilty was because he wanted to be out of jail at the time his son was born.  Wheelock further asserted that he knew who burglarized the machines, but that he had not wanted to get her in trouble.  He explained that his fingerprints were on the machine because he had attempted to bend the machine back into shape.

During his closing argument, the prosecutor contended that Wheelock was a habitual liar who should not be believed, and noted his "incredible" testimony regarding the burglary.

On appeal, Wheelock argued both that the prosecution's cross-examination of his father and its subsequent introduction of the burglary conviction plea agreement was

United States District Court

For the Northern District of California

1  erroneous under state law and violated his due process rights.  The California Court of

2  Appeal affirmed the trial court's admission of the evidence, concluding that it was relevant

3  since the defense had portrayed Wheelock as a persistent but hapless job seeker, in

4  contradiction to evidence that in connection with the Armored Transport robbery, Wheelock

5  immediately began plotting the robbery after learning that he was about to lose his job

6  there.  The court did not address Wheelock's federal due process argument.

7      In his habeas petition before this court, Wheelock argues that the prejudicial impact

8  of the conviction outweighs its impeachment value and undermines confidence in his

9  conviction.  The state counters that the conviction was relevant impeachment evidence

10 because Wheelock's father had testified that Wheelock was an upstanding citizen, and had

11 suggested that Wheelock's difficulty retaining jobs was for other reasons.  The state also

12 argues the misdemeanor burglary conviction was sufficiently dissimilar from the charges in

13 this case.  Finally, the state contends that the conviction would have come to light anyway

14 because Wheelock needed to testify in his own defense regarding the victim, Cortez's

15 alleged provocation of the homicide.

16      A state court's evidentiary ruling is not subject to federal habeas review unless the

17 ruling violates federal law, either by infringing upon a specific federal constitutional or

18 statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed

19 by due process.  *See Pulley v. Harris,* 465 U.S. 37, 41 (1984); *Jammal v. Van de Kamp*,

20 926 F.2d 918, 919-20 (9th Cir. 1991); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir.

21 1985).  The admission of evidence is not subject to federal habeas review unless a specific

22 constitutional guarantee is violated or the error is of such magnitude that the result is a

23 denial of the fundamentally fair trial guaranteed by due process.  *See Henry v. Kernan*, 197

24 F.3d 1021, 1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir. 1986).  The

25 Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly

26 prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the

27 writ."  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's

28 admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth

49

1   Circuit precedent but not contrary to, or an unreasonable application of, clearly established

2   Federal law under § 2254(d).  Admission of evidence may only violate a petitioner's due

3   process rights if there are no permissible inferences that the jury may draw from the

4   evidence can its admission.  *Jammal*, 926 F.2d at 920.

5        Because there was a permissible inference here, namely that Wheelock's father's

6   testimony regarding his work ethics and job retention was incomplete, admission of

7   Wheelock's misdemeanor burglary conviction did not violate his federal due process rights.

8   Accordingly, the state appellate court's decision was not contrary to, or involved an

9   unreasonable application of, clearly established Federal law, as determined by the

10  Supreme Court of the United States.

11  **VII.   Prosecution's Closing Argument**

12       During his closing argument, the prosecution suggested that Wheelock was a

13  habitual liar and admitted perjurer, and thus argued that Wheelock's testimony and alleged

14  theory of provocation by the victim were not credible.  In support, the prosecution repeated

15  portions of Wheelock's testimony that he argued lacked credibility, and noted that

16  Wheelock admitted in his direct testimony that he had "practiced" with defense counsel at

17  approximately thirty-five "prep" sessions prior to testifying at trial.

18       During his closing argument, defense counsel argued that the prosecution and

19  investigating police officers were biased and deliberately ignored exculpatory evidence.

20  He argued that the defense had been "up front about everything" to the jury, and suggested

21  that it was the prosecution that failed to obtain all of the evidence and who had attempted

22  to deceive the jury during its closing argument.

23       In rebuttal, the prosecutor acknowledged that the defense had "accused [him] of

24  dishonesty, no ethics, and a lack of integrity," but argued that the record refuted that claim.

25  R.T. 6596-97.  The prosecutor additionally made the following remarks:

26       He claims he told you the full story, the full story in his opening statement way
         back then.  Oh, really.  Oh, really.  Did he ever mention Wheelock's burglary
27       conviction to you in his opening statement?  No. No.  He fought to keep it out.
         If he didn't open the door about Wheelock's losing all of the jobs by posing
28       that question to Mr. Wheelock, the father, you would never have heard about

1    [the burglary conviction.] You wouldn't []ever have heard about the arrest or
     conviction or the mention of the burglary and the denial of the guard card
2    letter.

3    R.T. 6595.

4        Did he [defense counsel] tell you that his client would get up on the stand and
         commit perjury?  He omitted that.  Mr. Ogul seemed to be very upset that I
5        did not ask a certain question or some questions of his client, didn't have the
         guts to ask those questions.  Well, does he think I'm stupid enough to sit
6        there and ask a question I know that's been prepared for four years to get
         that answer?  Does he think I'm going to walk into that kind of trap and ask a
7        question when I know the whole of his testimony has been coaxed and
         prepped? . . . .  I know what to question because I knew the answer was
8        going to be, something that was prepped by defense counsel.

9    R.T. 6595-96.

10       . . . .

11       Defendant chose to tell the truth back in Utah to the police.  He chose to tell
         the truth back in Utah to the District Attorney.  And I ask you to recall a
12       question early on, what changed between California and the witness stand
         here in this case.  And it was the thirty-five hours of trial preparation.  Thirty-
13       five times of trial preparation.  What a coincidence.  Uh.  He's got no lawyers
         back in Utah, when he's talking to the police and the D.A., comes back to
14       California, gets a lawyer, and we've got a new story.  What an amazing
         coincidence.  And he [the public defender] talks about ethics.  He talks about
15       ethics.

16   R.T. 6601-02.

17       Wheelock did not object at the time of the argument, but instead, the next day

18   requested that the court admonish the jury regarding the first two statements above.

19   Specifically, defense counsel argued that

20       The first admonition that I'm requesting is that it was improper for yesterday,
         the prosecutor in surrebuttal argument, I'm sorry in his rebuttal argument,
21       commented that the *defense had tried to hide Mr. Wheelock's burglary
         conviction from you in their opening statement*.  It was improper for the
22       prosecutor to make that statement because you had previously ruled that conviction was
         inadmissible, and as of the time the opening statements were made that conviction was
23       inadmissible.  I'm requesting that admonition.

24       . . . .

25           The second admonition that I'm requesting is that it was wrong for the
         prosecutor to *attack the ethics of defense counsel.*  At times during this trial,
26       both attorneys attempted to go into areas you had ordered them previously
         not to go into and that's what I'm requesting with regard to the second one.

27

28   R.T. 6624-25.

United States District Court

For the Northern District of California

1    Without elaboration, the trial court declined to give either admonishment requested

2    by the defense.  R.T. 6626.

3    On appeal, though, Wheelock claimed that his due process rights were violated

4    when the prosecution committed misconduct in its closing argument based on the latter two

5    statements set forth above (as opposed to the former two statements that he challenged in

6    the trial court):  by accusing him of testifying untruthfully and by suggesting that defense

7    counsel had encouraged him to commit perjury during his testimony at trial.

8    The California Court of Appeal denied the claim, noting that Wheelock was mistaken

9    regarding defense counsel's request for an admonition.  It noted that his counsel had *not*

10   raised the particular issues he raised on appeal with the trial court the day after closing

11   arguments.  Instead, the court noted that the statements for which Wheelock requested an

12   admonishment before the trial court included: (1) the prosecution's reference to Wheelock's

13   alleged attempt to "hide" his burglary conviction from the jury; and (2) the prosecution's

14   suggestion that defense counsel improperly questioned Wheelock regarding subjects the

15   court had previously ruled inadmissible.  Given that Wheelock failed to raise the same

16   issues on appeal before the trial court, the state appellate court thus held that his failure to

17   object to the closing arguments precluded him from raising the issue on appeal.

18   Alternatively, the appellate court held that even if Wheelock had objected and the

19   prosecution had made the comments alleged, they were not sufficiently pervasive or

20   egregious to warrant reversal under California law.

21   Wheelock again argues before this court that the prosecutor improperly impugned

22   the integrity of his counsel and his own honesty.  He contends that because the state's

23   case was based largely on his credibility, the misconduct was prejudicial because it entirely

24   discredited the defense.  Wheelock also asserts that the state appellate court was wrong in

25   holding that he failed to preserve the error for appeal because defense counsel requested

26   the court to admonish the jury regarding the prosecutor's remarks.  *See* R.T. 6624-26.

27   The state counters that Wheelock has procedurally defaulted this claim based on

28   California's contemporaneous objection requirement.  *See Rich v. Calderon*, 187 F.3d

1   1064, 1070 (9th Cir. 1999) (requirement is a valid procedural bar for purposes of federal

2   habeas review).  Alternatively, the state argues that even if this court considers the claim

3   on the merits, the prosecution's rebuttal statements were appropriate comments on

4   defense counsel's closing statement, and constituted an "invited response" to defense

5   counsel's remarks.  *See United States v. Young*, 470 U.S. 1, 11-13 (1985); *United States v.*

6   *Jackson*, 84 F.3d 1154, 1158 (9th Cir. 1996).  Even if the prosecution's comments

7   constituted error, the state argues they were harmless given the overwhelming evidence of

8   Wheelock's guilt, including his Plan demonstrating premeditation, his incriminating

9   statements, and his possession of the murder weapon and stolen cash.

10         In reply, Wheelock argues that he did not procedurally default this claim because the

11   California Court of Appeal's waiver determination was erroneous under state law, and

12   because its factual finding that defense counsel failed to raise the issue was unreasonable

13   and is not entitled to deference.  As for the merits of his claim, Wheelock further contends

14   that the state court's determination that any error was harmless was unreasonable because

15   the comments in this case rendered the trial unfair and mandated reversal.  *See Berger v.*

16   *United States*, 295 U.S. 78, 88 (1935).  In support, he argues that the prosecution's

17   remarks gave the jury a basis to reject the entirety of his testimony.

18         At the outset, the court notes that it need not reach the merits of both instances of

19   prosecutorial misconduct challenged here by Wheelock.  Under California law, claims of

20   prosecutorial misconduct must be objected to at trial in order to be preserved upon appeal.

21   *See People v. Fosselman*, 33 Cal. 3d 572, 580-81 (1983).  A petitioner who fails to observe

22   a state's "contemporaneous objection" rules may not challenge the constitutionality of the

23   conviction in federal court.  *See Engle v. Isaac*, 456 U.S. 107, 129 (1982); *United States v.*

24   *Frady*, 456 U.S. 152, 162-169 (1982) (while plain error applies in determining whether a

25   defendant may raise a claim for the first time on direct appeal, cause and prejudice

26   standard applies in determining whether that same claim may be raised on habeas).

27         Here, assuming Wheelock challenged different instances of misconduct before the

28   state trial court and on appeal, then he has procedurally defaulted this claim.  As set forth

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   above, Wheelock challenged two instances of prosecutorial misconduct at trial: 1) the

2   prosecutor's suggestion during closing argument that the defense tried to hide Wheelock's

3   burglary conviction from the jury during opening arguments; and 2) the prosecution's attack

4   on the ethics of defense counsel.  On appeal, though, Wheelock also challenged the

5   prosecution's alleged attacks on his credibility during his closing argument - misconduct

6   that he did *not* challenge at trial.  Accordingly, the state court's finding that Wheelock

7   waived that argument was correct, and therefore, for purposes of these proceedings, he

8   has procedurally defaulted his challenge to that instance of misconduct.  However,

9   Wheelock's challenge on appeal to the prosecution's suggestion that defense counsel

10  "prepped" him to commit perjury was, by contrast, arguably raised by Wheelock before the

11  trial court in the context of Wheelock's assertion that the prosecution improperly attacked

12  the ethics of defense counsel.  Because it is a close call regarding this issue, the court has

13  addressed the merits of Wheelock's claim that the prosecution improperly impugned the

14  ethics of his counsel.

15        Prosecutorial misconduct is cognizable in federal habeas proceedings.  The

16  appropriate standard of review is the narrow one of due process and not the broad exercise

17  of supervisory power.  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  A defendant's due

18  process rights are violated when a prosecutor's misconduct renders a trial "fundamentally

19  unfair." *Id.; Smith v. Phillips,* 455 U.S. 209, 219 (1982) ("the touchstone of due process

20  analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the

21  culpability of the prosecutor").  Under *Darden*, the first issue is whether the prosecutor's

22  remarks were improper; if so, the next question is whether such conduct infected the trial

23  with unfairness.  *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005).  A prosecutorial

24  misconduct claim is decided "on the merits, examining the entire proceedings to determine

25  whether the prosecutor's remarks so infected the trial with unfairness as to make the

26  resulting conviction a denial of due process." *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir.

27  1995).

28        The first factor in determining if misconduct amounted to a violation of due process

**United States District Court**

For the Northern District of California

is whether the trial court issued a curative instruction.  When a curative instruction is

issued, a court presumes that the jury has disregarded inadmissible evidence and that no

due process violation occurred.  *See Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987); *Darden*,

477 U.S. at 182 (the Court condemned egregious, inflammatory comments by the

prosecutor but held that the trial was fair since curative actions were taken by the trial

judge); *Tan*, 413 F.3d at 1115 ("we presume jurors follow the court's instructions absent

extraordinary circumstances").  This presumption may be overcome if there is an

"overwhelming probability" that the jury would be unable to disregard evidence and a strong

likelihood that the effect of the misconduct would be "devastating" to the defendant.  *See*

*Greer*, 483 U.S. at 766 n.8; *Tan,* 413 F.3d at 1115-16 (finding trial fair where jury received

instructions five different times to consider only the evidence presented, and not its

sympathy for the victim's life story).

Other factors which a court may take into account in determining whether

misconduct rises to a level of due process violation are: (1) the weight of evidence of guilt,

*compare United States v. Young*, 470 U.S. 1, 19 (1985) (finding "overwhelming" evidence

of guilt) *with United States v. Schuler*, 813 F.2d 978, 982 (9th Cir. 1987) (in light of prior

hung jury and lack of curative instruction, new trial required after prosecutor's reference to

defendant's courtroom demeanor); (2) whether the misconduct was isolated or part of an

ongoing pattern, *see Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987); (3) whether the

misconduct relates to a critical part of the case, *see Giglio v. United States*, 405 U.S. 150,

154 (1972) (failure to disclose information showing potential bias of witness especially

significant because government's case rested on credibility of that witness); and (4)

whether a prosecutor's comment misstates or manipulates the evidence, *see Darden*, 477

U.S. at 182.

A court will also examine whether the defense invited the error.  While a prosecutor

may fairly rebut defense counsel's contentions, *see United States v. Bagley*, 772 F.2d 482,

494 (9th Cir. 1985), the prosecution is not entitled to use improper tactics in response to

tactics of defense counsel.  *See Young*, 470 U.S. at 7.  However, in deciding whether due

United States District Court

For the Northern District of California

1   process is violated, a court will look to the fairness of the trial, not the conduct of the

2   defendant.  *See United States v. Agurs*, 427 U.S. 97, 110 (1976).  Therefore, where a

3   prosecutor responds no more than necessary to "right the scale" unbalanced by defense

4   use of improper tactics, such comments would not warrant reversal.  *See Young*, 470 U.S.

5   at 12-13 (reviewing court must weigh the impact of the prosecutor's remarks and take into

6   account defense counsel's opening salvo).

7          A prosecutor may not gratuitously attack a defendant's choice of counsel or defense

8   counsel's integrity and veracity.  *See Bruno v. Rushen*, 721 F.2d 1193, 1195 (9th Cir. 1983)

9   (prosecutor's comments equating defendant's hiring of counsel with guilt and comments

10  attacking integrity of defense counsel without evidence improper and error of constitutional

11  dimension); *cf. United States v. Steele*, 298 F.3d 906, 912 (9th Cir. 2002) (questioning of

12  prospective juror who had been public defender whether he defended clients who were

13  guilty was permissible because it was not a comment on defendant's attorney or defense

14  attorneys in general).  Nor may the prosecutor attack defense counsel's legitimate trial

15  tactics.  *See United States v. Frederick*, 78 F.3d 1370, 1379-80 (9th Cir. 1996)

16  (prosecutor's back-handed compliment to defense lawyer for confusing witness, which

17  appeared to imply that his methods were somewhat underhanded and designed to prevent

18  truth from coming out, was improper but not alone reversible error).  However, there is no

19  constitutional error unless the comments were prejudicial to the point of denying the

20  defendant a fair trial.

21         In light of this court's review of defense counsel's own closing argument in

22  Wheelock's case, the prosecution's remarks regarding defense counsel's ethics were

23  neither improper, nor did they infect the trial such that Wheelock's conviction violated due

24  process.  The comments were directly responsive to defense counsel's own arguments

25  regarding the prosecutor's ethics, and given the other overwhelming evidence of guilt and

26  the other evidence of Wheelock's lack of credibility, the challenged comments did not deny

27  Wheelock a fair trial.  For these reasons, the state appellate court's decision was not

28  contrary to, or involved an unreasonable application of, clearly established Federal law, as

1    determined by the Supreme Court of the United States.

2    **VIII.   Cumulative Impact of Errors**

3         Finally, Wheelock asserts that the cumulative effect of errors warrants relief.

4    "Cumulative error applies where although no single trial error examined in isolation is

5    sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still

6    prejudice a defendant." *Mancuso v. Oliverez*, 292 F.3d 939, 957 (9th Cir. 2002).  However,

7    because there was no single constitutional error in this case, there can be no cumulative

8    effect.

9                          **CERTIFICATE OF APPEALABILITY**

10        To obtain a COA, Wheelock must make "a substantial showing of the denial of a

11   constitutional right."  28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the

12   constitutional claims on the merits, the showing required to satisfy § 2253(c) is

13   straightforward.  "The petitioner must demonstrate that reasonable jurists would find the

14   district court's assessment of the constitutional claims debatable or wrong." *Slack v.*

15   *McDaniel*, 529 U.S. 473, 484 (2000).  Section 2253(c)(3) requires a court granting a

16   COA to indicate which issues satisfy the COA standard.  Here, the court finds that three

17   issues presented by Wheelock in his petition meet the above standard and accordingly

18   GRANTS the COA as to those issues.  *See generally Miller-El v. Cockrell*, 537 U.S. at 322.

19   Those issues are:

20        (1) the trial court's dismissal of a juror during deliberations violated his constitutional

21        right to due process and to a trial by a fair and impartial jury;

22        (2) the Alameda County grand jury and forepersons selection procedures violated

23        his due process and his equal protection rights;[8] and

24        (3) the admission of Wheelock's taped statement violated his Sixth Amendment right

25        to counsel.

26        Accordingly, the clerk shall forward the file, including a copy of this order, to the

27

28   _____

          [8]As noted above, this issues actually includes four sub-claims.

                                         57

**United States District Court**
For the Northern District of California

1   Court of Appeals. *See* Fed. R. App. P. 22(b); *United States v. Asrar*, 116 F.3d 1268, 1270

2   (9th Cir. 1997).

3   **CONCLUSION**

4         For the foregoing reasons, Wheelock's petition for a writ of habeas corpus is

5   **DENIED**.  The clerk shall close the file.

6         **IT IS SO ORDERED.**

7

8   Dated: February 2, 2012

9

10                                   PHYLLIS J. HAMILTON
                                  United States District Judge

**United States District Court**
For the Northern District of California

58